**UNITED STATES v. GENERAL PETROLEUM CORPORATION OF CALIFORNIA et al.**

No. 467–B–Civ.

District Court, S. D. California, Central Division.

March 30, 1946.

Supplemental Opinion Jan. 10, 1947.

228

The action was dismissed as to The Texas Company and Kettleman North Dome Association.

F. B. Critchlow, Eugene D. Williams, Joseph C. Gill, James A. Murray, Richard H. Hill and Marvin J. Sonosky, Sp. Assts. to Atty. Gen., for plaintiffs.

A. L. Weil and Martin J. Weil, both of Los Angeles, Cal., for defendant General Petroleum Corporation of California.

John M. Hall, Max Felix, H. G. Hayes, Marcus Mattson and Lawler, Felix & Hall, all of Los Angeles, Cal., for defendants Standard Oil Co. of California and Standard Oil Co. of Texas.

George Harnagel, Jr., William E. Wright, F. F. Thomas, Jr., and McCutchen, Olney, Mannon & Greene, all of Los Angeles, Cal., for defendant Shell Oil Co., Inc.

Harrison Guio, W. F. Kiessig, of San Francisco, Cal., and Paul Broxon, of Los Angeles, Cal., for defendant Tide Water Associated Oil Co.

Jerry H. Powell and Paul M. Gregg, both of Los Angeles, Cal., for defendant Union Oil Co. of California.

L. R. Martineau, Jr., P. C. Black and Warren Stratton, all of Los Angeles, Cal., for defendant Continental Oil Co.

Frederick D. Anderson and Bertram L. Linz, both of Los Angeles, Cal., for defendant Seaboard Oil Co. of Delaware.

Herbert W. Clark, Emory L. Morris and Morrison, Hohfeld, Foerster, Shuman & Clark, all of San Francisco, Cal., for defendant Honolulu Oil Corporation.

Thomas A. J. Dockweiler and Dockweiler & Dockweiler, all of Los Angeles, Cal., for defendants Pacific Western Oil Corporation and George F. Getty, Inc.

Martin J. Weil, of Los Angeles, Cal., for defendant Pioneer Kettleman Co.

George W. Nilsson, of Los Angeles, Cal., for Kettleman North Dome Ass'n.

Glen Behymer, of Los Angeles, Cal., for defendant Ervin S. Armstrong.

R. K. Barrows, J. A. Tucker and Charles C. Stanley, all of Los Angeles, Cal., for defendant Texas Co.

Chester Dolley, Edward W. Lloyd, John H. Blake and Hanna & Morton all of Los Angeles, Cal., for defendants Silas L. Gillan and Etta Helm as executrix of Estate of Lesrey G. Helm, deceased.

Neil S. McCarthy, Earl L. Banta, Howard P. Hall and Franklin W. Peck, all of Los Angeles, Cal., for defendants Belmont Inv. Co., Cynthia Beal, Neil S. McCarthy and A. Calder Mackay as trustees of said Belmont Inv. Co., a corporation in process of dissolution.

Karl B. Rodi, Olin Wellborn III, Vernon Barrett and Frank C. Hubbard, all of Los Angeles, Cal., for defendants Carrie Estelle Doheny, Lucy Smith Battson and Los Nietos Co.

BEAUMONT, District Judge.

This action was brought by the United States to obtain a judicial determination of the extent of authority of the Secretary of the Interior to place minimum limitations upon valuations for royalty purposes of the interests of the United States in oil and gas produced from public lands in the Kettleman Hills field of California held by

230

defendants under oil and gas leases issued pursuant to the provisions of Section 14 of the Act of Congress approved February 25, 1920, known as the Mineral Lands Leasing Act, 30 U.S.C.A. § 181 et seq.; to recover from defendants certain unpaid and delinquent royalties which have become due on the basis of limitations on valuations as determined by the Secretary of the Interior; and to obtain cancellation of leases of such defendants as fail to comply with the court's orders herein sought. The prayer of the amended complaint seeks, in the event the orders of the Secretary are held invalid, a decree prescribing the proper basis upon which determination of the value of the government royalty interest shall be made, and an order that the lessees be required to account accordingly.[1]

Congress, by the aforesaid Mineral Leasing Act of 1920, authorized the Secretary of the Interior to enter into leases of the public mineral lands with permittees who had previously established to his satisfaction that valuable oil or gas had been discovered within the limits embraced in their permits.[2] The Act specified the amount of acreage which the Secretary was authorized to lease, the term of the lease

and the royalty which must be obtained, required insertion in the leases of provisions against waste and provisions to insure the exercise of reasonable diligence, skill and care in the operation of the property, and authorized the Secretary to include such other provisions as he deemed necessary to insure the sale of the production of such leased lands to the United States and to the public at reasonable prices, "for the protection of the interests of the United States, for the prevention of monopoly, and for the safeguarding of the public welfare." 30 U.S.C.A. § 187. Congress further authorized the Secretary to prescribe necessary rules and regulations under the Act and *to do all things necessary to carry out and accomplish the purposes of the Act.* By section 31 of the Act it was provided that any lease issued by the Secretary under the Act might be forfeited and canceled by an appropriate proceeding in the proper United States district court in the event that the lessee failed to comply with the provisions of the Act, or of the lease thereunder issued, or of the general regulations which the Secretary promulgated under the Act, and which were in force at the date of the lease.

Specifically as to royalties due the gov-

[1] There are two classes of defendant lessees. The first group comprises those lessees which are engaged either directly or through their subsidiaries in all branches of the petroleum industry from the production of crude oil to the marketing at wholesale and retail of refined petroleum products. Such lessees are herein designated as "integrated" defendants, and they are defendants General Petroleum Corporation of California (sometimes herein referred to as "General"), Standard Oil Company of California (referred to as "Standard"), Shell Oil Company, Incorporated (referred to as "Shell"), Tide Water Associated Oil Company ("Associated"), and Union Oil Company of California ("Union").

The second group of lessees, herein designated as the "nonintegrated defendants"—that is, those defendant lessees not engaged in all branches of the petroleum industry—are as follows: Continental Oil Company ("Continental"), Seaboard Oil Company of Delaware ("Seaboard"), Honolulu Oil Corporation ("Honolulu"), Standard Oil Company of Texas (hereinafter referred to by its

full title to distinguish it from Standard Oil Company of California), Pacific Western Oil Corporation ("Pacific Western"), Pioneer Kettleman Company ("Pioneer Kettleman"), George F. Getty, Incorporated, Belmont Investment Company and Cynthia Beal, Neil S. McCarthy, and A. Calder Mackay as trustees of said Belmont Investment Company, Ervin S. Armstrong, Etta Helm as executrix of the estate of Lesrey G. Helm, Silas L. Gillan, Carrie Estelle Doheny, Lucy Smith Battson, Los Nietos Company, and Kettleman North Dome Association, generally referred to herein as "Kenda".

[2] These public mineral lands, since the Presidential Orders of withdrawal issued in the period between September 27, 1909 and December 30, 1910, had been withdrawn from public entry and acquisition in order to protect and conserve the mineral deposits of the nation from an increasing dissipation occurring in the first decade of the century. The Mineral Leasing Act opened these lands to the public for leasing, under strict limitations.

ernment under the leases, the Act provided that "such leases shall be * * * upon a royalty of 5 per centum [3] in amount or value of the production." 30 U.S.C.A. § 223.

There were two general sets of regulations which the Secretary promulgated under the Act and which were in force at the date of the leases now before the court. The first were the regulations of 1920, containing a proposed standard form of lease. Thereafter followed the regulations of July 1, 1926. Insofar as here pertinent, the regulations of 1926 set up the administrative machinery for supervision of the leased areas and provided by section 1(h) thereof that the supervisor therein designated to be appointed by the Secretary should compile records of production of oil, gas, and natural-gas gasoline from the leases and compute and report the amount and value of accrued royalties. By section 2(s)[4] the regulations provided that the lessee should file with the Secretary copies of all contracts for the disposition of oil, natural gas and natural-gas gasoline produced, except such portions as were used for production purposes, and in the event the United States elected to take its royalties in money instead of in oil, gas or gasoline, the lessee was not to sell or otherwise dispose of the products of the land leased except in accordance with the sales contract or other method first approved by the Secretary. By section 4 of the regulations the method of computation and payment of royalties on natural gas and natural-gas gasoline was specified. These latter provisions will be considered later under the heading "The Net Realization Problem". By section 6 the lessees were given the right to appeal to the Secretary from all orders issued by the supervisor.

The discovery well of the Kettleman Hills public mineral lands was "brought in" October 5, 1928. The leases now before the court were executed in the period from 1929 to 1931. In general, these leases followed the precise directions of the statute,[5] and called for a government royalty of 5% on all oil and gas produced. In particular they contained two general provisions which have given rise to the present controversy. These were the provisions of section 2(c) (3) and 2(d) of the leases.

Section 2(c) (3) provides that "the value in the field where produced, of gas and casing-head gasoline, for royalty purposes, unless such gas or casing-head gasoline is disposed of under an approved sales contract or other method as provided in subdivision (d) of this section, shall be as fixed by the Secretary of the Interior." By Section 2(d) the lessees agreed "to file with the Secretary of the Interior copies of all sales contracts for the disposition of oil and gas produced hereunder except for production purposes on the land leased, and in the event the United States shall elect to take its royalties in money instead of in oil or gas, not to sell or otherwise dispose of the products of the land leased except in accordance with a sales contract or other method first approved by the Secretary of the Interior." Section 2(d), it may readily be seen, was identical with section 2(s) of the regulations of 1926.

On or about July 25, 1929, in order to forestall a wasteful campaign of competitive drilling at Kettleman Hills, a so-called "shut-in" agreement was entered into between the United States and its permittees and the owners and lessees of most of the privately-owned land in the field, whereunder production at Kettleman Hills was limited for a certain period pending arrangement for development and operation of the field's productive acreage as a unit. After Congress amended the Mineral Leasing Act of 1920 on July 3, 1930, 30 U.S.C.A. § 184, in order to authorize such unit plan, the Secretary of the Interior and the lessees

---

[3] A royalty of 12½% was by the Act authorized as to leases of additional acreage. The so-called "A" leases involved in the instant case called for 5% royalty; the so-called "B" leases called for 12½% royalty.

[4] Sec. 2(s) came under the heading "Requirements for Lessees".

[5] Thus the leases included provisions for diligence of operation, prevention of waste, provisions to insure the sale of the production to the United States and to the public at reasonable prices, provisions to prevent monopoly and to safeguard the public welfare, and provisions for judicial forfeiture proceedings in case of default.

herein entered into the contemplated agreement. By its terms a corporation, known as Kettleman North Dome Association (hereinafter referred to as "Kenda"), was formed, of which the lessees herein became members, and to which they transferred their operating rights to the leases and their productive facilities in the field. It was agreed that the association should develop and operate the lands and dispose of the products in conformity with the operating regulations then in effect, and production from the leased lands was to be distributed by Kenda to the members according to their respective interests. Each member agreed to pay its own royalties to the government.

In the years 1929–1931, the Secretary became convinced that the prices at which the defendant lessees were disposing of their oil, gas and gasoline from Kettleman Hills were inadequate to reflect the true worth or value of those products for royalty purposes when the government took its royalties in money. Accordingly, on June 4, 1931, the Secretary promulgated an order seeking to protect the government royalty interest. This order has produced much of the controversy now before the court.

By the order of June 4, 1931, the Secretary of the Interior advised the lessees as follows: "Your attention is called to the lease requirement (Sec. 2-d) that when the United States shall elect to take its royalties in money instead of in oil or gas, the lessee shall not sell or otherwise dispose of the products of the land leased except under a sales contract or other method first approved by the Secretary * * *: to the lease provision (Sec. 2-c-3) that the value in the field where produced, of gas and casing-head gasoline for royalty purposes shall be as fixed by the Secretary * * *,

and to the fact that *the minimum price basis for royalty settlements on gas in California has heretofore been fixed at 5¢ per 1,000 cubic feet* [6] *and on natural gas gasoline in Kettleman Hills at 6¢ below the current published San Francisco price for gasoline in tank wagon lots, exclusive of tax,* such prices to be used in computing royalty accruing to the Government unless the lessee receives a greater price in which case such greater price shall be used. Supplementing these provisions, effective July 1, 1931, and until further notice, *the highest price posted in California for crude oil of equal or lower gravity is fixed as the minimum price basis on which settlements shall be made for royalty on crude oil produced in the North Dome Kettleman Hills field,* a higher price to be made the basis of settlement if and when obtainable. * * *" (Emphasis added.)

On June 23, 1931, the Secretary promulgated a second order affecting royalty computations. This order likewise has produced much dispute between the parties herein. By that order the Secretary modified the previously-existing minimum price basis for computation of natural-gas gasoline royalties as follows: "Effective July 1, 1931, and until further notice, for the purpose of computing royalty accruing from lands of the United States in California, *the minimum price per gallon of natural-gas gasoline in the field where produced shall be based on the average service-station price, exclusive of tax, for gasoline of standard quality at Standard and Shell stations in the metropolitan area of San Francisco and Los Angeles,* as determined daily by the supervisor * * *, *and shall be the sum of the following three items: (1) One cent; (2) one-half the excess, if any, of said*

---

[6] According to plaintiff's counsel (Tr. 89, pp. 4527, 4528; 4530): " * * * the 5 cent minimum for California was established by a rule or decision which applied to the State of California a minimum price which had been theretofore fixed in the Rocky Mountain District. That application to California was made * * * in 1922 and has been uniformly applied by the Department of the Interior since that time,—between that time and the time of the Secretary's order of June 4, 1931.

* * * * * * *

"It was made in connection with a contract of the Honolulu Oil Company, I think, and some gas company under which the sale of gas was made at a price less than 5 cents. In passing on that contract the 5¢ minimum was established as the basis for settlement in California, applying the same minimum price which had been theretofore applied in the Rocky Mountain District." Exhibits S1–4 are evidence of a uniform application of the 5 cents minimum price basis in the period prior to 1931.

*service-station price over 5 cents; (3) one-half the excess, if any, of said service-station price over 15 cents;* provided, that such minimum price shall be used in computing royalties unless a greater price is received currently for the natural-gas gasoline produced, in which case such greater price shall be used in computing royalties. * *" (Emphasis added.)

The lessees now before the court objected to reporting the value of their Kettleman Hills production and to paying their government royalties on the basis of the aforesaid minimum-price orders of the Secretary. Insisting that under the Mineral Leasing Act and their leases they were obligated to pay only according to the prices currently obtaining in the field, and challenging the authority of the Secretary under the Act and the leases to impose minimum-price limitations on their royalty obligations, each of defendants, excepting only defendants Standard, Pacific Western, and Shell (which reported and paid their royalties as directed by the minimum-price orders, but only under protest), reported and paid its oil, gas and gasoline royalties on the basis of prices it was currently paying or obtaining for its products at Kettleman Hills.

Each lessee who paid on the basis of Kettleman Hills market prices, without regard to the Secretary's minimum-price orders, was by the supervisor billed for the deficiency, if any, between such payment and that required by the Secretary's orders. As they had a right to do by the provisions of section 6 of the regulations of 1926, such lessees (except General Petroleum Corporation) appealed from the supervisor's billing to the Secretary of the Interior.

On January 11, 1932, in Washington, D. C., the Secretary of the Interior and the appealing lessees met for a conference on the disputed royalty matters.[7] The Secretary afforded the lessees opportunity for full discussion of the matters in controversy. At the close of the conference the Secretary announced that the extreme seriousness of the issues rendered the matter one which "should be permanently settled by judicial rather than by administrative action."

Thereafter on January 22, 1932, and before formally ruling on the lessees' appeals, the Secretary referred the royalty controversy to the Geological Survey for a field investigation and report. The Survey report—hereinafter referred to as the "Mendenhall Report"—was presented on June 6, 1932, and its conclusion upheld the reasonableness of the rates previously fixed by the Secretary. Copies of the report were sent to the lessees, together with an invitation to the latter to submit any data they wished to have considered prior to the Secretary's ruling on their appeals.

On November 30, 1932, the Secretary filed his decision on the appeals. Referring again to his opinion that the royalty controversy should be settled by judicial action, and stating that "the appellants have also indicated an intention to litigate these issues," he advised that "this decision will be limited to findings of law and fact." He then ruled that under the Act, the regulations, and the leases, the Secretary was authorized to fix minimum valuations for the computation of oil, gas and gasoline royalties and that "if [the values as fixed] are not reasonable a detailed examination of expert witnesses and of [the lessees'] books and operations * * * will be required to establish better ones. A judicial, and not an administrative, forum is required for such an issue. Accordingly, on the evidence before it, the Department does not feel warranted to disapprove the recommendations of the Geological Survey as to the reasonableness of the schedules now in force, and holds that they are reasonable. The appeals are severally denied. * * * In default of payment within 30 days * * * of all royalty accrued, the Department of Justice will be requested to institute suit for their collection. The Department does not deem it necessary to ask cancellation of the leases * * *. Both the Government

---

[7] In attendance were representatives of Continental, Kenda, General Petroleum, Standard Oil of California, Kettleman Oil Corporation & Pacific Western, Milham, Shell Union Oil Corporation & George F. Getty, Inc., Union of California, Belmont Investment Company & Lincoln Drilling Company, Petroleum Securities Company, Associated Oil Company and Tidewater Oil Company.

and the lessees will benefit * * * by having these questions set at rest by judicial proceedings."

It is apparent from the record before the court that as a result of the Washington conference and the subsequent ruling of the Secretary upon the appeals, the parties to the leases expected litigation of the matters in controversy. The present suit was not brought until July 10, 1939. In the meantime the lessees continued, as they had before, to pay their royalties on the prices prevailing in the field (except for the three aforementioned lessees who paid under protest the full amount required by the Secretary). As before, the supervisor billed them for the deficiency, and they (excepting General) took appeals from such billings. It was not until August 4, 1938, that a formal ruling on these later appeals was announced, and then the lessees were advised that "The decision of November 30, 1932, has not been reversed or modified and is therefore controlling. The * * * appeals are denied. Any further appeals will be considered as denied in so far as they raise no new factual controversy."

On June 7, 1937, the Secretary issued the last of the orders which is in dispute between the government and its lessees. This order pertained to the method of computing royalties on natural gas and natural-gas gasoline and will be discussed later under "Net Realization." Appeals from billings of the supervisor under this order were denied by the Secretary on July 7, 1938, the latter stating that "all future appeals from monthly billings will be considered as denied in so far as they raise no new factual controversy."

As outlined in the pre-trial order of this court of June 25, 1942, the issues before the court are the following: (1) did the Secretary of the Interior have power to determine the value of oil, natural gas and natural-gas gasoline, or any of them, for royalty purposes; (2) if he had such power, were all or any of the orders, directions or determinations involved herein valid exercises of such power; (3) if he did not have such power, what were the reasonable values of such commodities.

 In resolving the foregoing issues it must be remembered that the government's role is taken to be no different from that of any private lessor or proprietor, for while the Kettleman Hills lands involved are public mineral lands, and as such until their disposition are under the supervision and control of Congress,[8] the government as to such lands acts in a proprietary capacity, and treats with them in the same way as does the private landowner.[9] Regardless of the type of lease Congress might authorize, a lease executed in accordance with what it *has* authorized becomes a private, contractual matter and is to be interpreted according to the general rules of law respecting contracts between individuals.[10] And regardless of what Congress has authorized, unless the authorized provision is mandatory, it may not be "read in" if the Secretary omitted to include it.[11]

In considering the issues now before the court the royalty requirements as to oil will be separately considered from those pertaining to gas and gasoline.

[8] Art. IV, Sec. 3, Cl. 2 of Constitution of the United States; United States v. San Francisco, 310 U.S. 16, 29, 60 S. Ct. 749, 84 L.Ed. 1050; Light v. United States, 220 U.S. 523, 536, 537, 31 S.Ct. 485, 55 L.Ed. 570; Standard Oil Co. of California v. United States, 9 Cir., 107 F.2d 402, 409–410.

[9] Camfield v. United States, 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260; United States v. Midwest Oil Co., 236 U.S. 459, 474, 35 S.Ct. 309, 59 L.Ed. 673; Sinclair v. United States, 279 U.S. 263, 297, 49 S.Ct. 268, 73 L.Ed. 692; Van Lear v. Eisele, C.C.Ark., 126 F. 823, 825–826.

[10] Reading Steel Casting Co. v. United States, 268 U.S. 186, 188, 45 S.Ct. 469, 69 L.Ed. 907; United States v. Bostwick, 94 U.S. 53, 66, 24 L.Ed. 65; Cory Bros. & Co. v. United States, 2 Cir., 51 F.2d 1010, 1012; United States v. Geo. A. Fuller Co., D.C., 296 F. 178, 180; United States v. A. Bentley & Sons Co., D.C., 293 F. 229, 235.

[11] See Cong. Record, vol. 58, p. 7643, as to discussion in the House of Representatives of certain features of the Mineral Leasing Act as it was in the course of preparation. It was there said: "Mr. Anderson. Mr. Chairman, this bill is much more important than the attendance here at the moment would indicate. It disposes of the last of the.

## Oil Royalties

The leases call for a royalty of 5% of the *value* of the oil produced. This provision complies with the terms of the Mineral Leasing Act. The word "value" as thus used is not defined in the Act or the leases. It will be presumed, therefore, that Congress intended the natural import of such word of common usage.[12] "Value", in common usage, means "reasonable market value"; that price which a product will bring in an open market, between a willing seller and a willing buyer.[13] The parties do not dispute this interpretation of the term.[14] Thus the lessees are obligated to return to the government the specified percentage of the *reasonable market value*[15] at Kettleman Hills[16] of the oil produced.

After his investigation of the facts and circumstances, the Secretary determined that the market *price* of oil at Kettleman Hills did not represent the reasonable market *value* of such oil. By his order of June 4, 1931, he rejected such market price as the basis of royalty computations and sought to fix the market value on the basis of the highest price posted in California for oil of equal gravity. The right so to fix the value of oil the Secretary claimed under section 2-c-3 and section 2-d of the leases.

Section 2-c-3 of the leases, as hereinbefore quoted, provided that the value in the field where produced of *gas and gasoline* for royalty purposes, unless such gas or gasoline was disposed of under an approved sales contract or other method as provided in section 2-d, should be *fixed by the Secretary*. In terms this section deals exclusively with gas and gasoline. Oil is not mentioned in this section.

Section 2-d required the lessees to file with the Secretary copies of all contracts for the disposition of oil and gas, and in the event the United States elected to take its royalties in money,[17] the lessees agreed not to dispose of their products except in accordance with a contract first approved by the Secretary. While oil is in terms included in this section, the only power reserved to the Secretary under it relating to oil is the power to disapprove contracts of sale of such oil and to prevent disposition of the oil under such contracts. It is not a power reserved to fix the value of that oil.

Plaintiff seeks to read into section 2-c-3 the right to fix the value of oil. In the court's opinion 2-c-3 may not be so construed. Not only is there no express inclusion in 2-c-3 of oil but its inclusion is not implied. *When the Secretary desired*

natural resources of the territory owned by the United States.˙ It is doubly important, because these resources once passing out of the hands of the United States under a lease granted under this act are no longer subject to the legislative action of Congress. In other words, when the terms of the lease have once been established by the lease itself, those terms cannot then be changed by the action of Congress [or its agent, the Secretary] until the expiration of the term of the lease itself."

[12] United States v. Stewart, 311 U.S. (1), 63, 61 S.Ct. 102, 85 L.Ed. 40; Helvering v. Hutchings, 312 U.S. 393, 396, 61 S.Ct. 653, 85 L.Ed. 909; Burke v. Southern P. R. Co., 234 U.S. 669, 676, 679, 34 S.Ct. 907, 58 L.Ed. 1527; Robinson v. Baltimore & O. R. Co., 237 U.S. 84, 94, 35 S.Ct. 491, 59 L.Ed. 849; Hull v. Philadelphia & Reading R. Co., 252 U.S. 475, 479, 40 S.Ct. 358, 64 L.Ed. 670.

[13] Barnsdall Refining Corp. v. Cushman-Wilson Oil Co., 8 Cir., 97 F.2d 481, 484; Walter v. Duffy, 3 Cir., 287 F.

41, 44; Dean v. Hawes, 29 Cal.App. 689, 693, 157 P. 558.

[14] For example, brief of General Petroleum, pp. 23, 24, 103, brief of General Petroleum at inception of trial, p. 5; brief of Continental, pp. 39, 40; brief of Continental at inception of trial, pp. 20 and 51; brief of Standard Oil Co. of Texas & Honolulu Oil Corp., pp. 9, 10; brief of Helm & Gillan at inception of trial; closing brief of United States, p. 30; brief of Doheny et al., p. 4.

[15] The court from time to time in the course of the trial stated that the "value" with which the issue herein is concerned is market value. Sometimes the term "reasonable market value" is employed and at others, "market value". One is synonymous with the other, and they are used herein interchangeably.

[16] It was agreed at the pre-trial conferences that "value" means value at the wells at Kettleman Hills. Pre-trial order, p. 25.

[17] The United States, after the Order of June 4, 1931, took its royalties in money during the period in controversy.

*to reserve the right to fix the value of gas and gasoline he did so expressly.* If it was necessary to make that express statement as to gas and gasoline, it was as necessary to make that statement as to oil, if the power to fix the value thereof was to be reserved to him.

Plaintiff contends that section 2-d supports the claimed power. It is to be noted, however, that section 2-d is not the basis of the value-fixing right as to gas and gasoline; such right, as heretofore observed, is reserved expressly in an independent, separate section, 2-c-3. It does not appear to the court that the right to disapprove the oil-disposal contracts (2-d) gives an implied right to fix the value of the oil.

Plaintiff argues that since oil is much more important as a product than gas or gasoline there is no reason the Secretary should have reserved a right to protect the government's royalty interests as to gas and gasoline and at the same time have omitted to reserve that right as to oil.[18] The court is not concerned with the reason for the omission. It here seeks only to ascertain whether the right to fix the value of oil was *in fact* a power reserved to the Secretary under the leases. The Secretary was not left without recourse when, in his opinion, the prevailing market price of oil did not reflect its true or reasonable market value. He could disapprove the sale of oil at such prices and prevent the establishment of those prices as an apparent basis of royalty value-determination. This power of contract disapproval under 2-d was expressly upheld in Wilbur v. Texas Co.,

---

[18] The answer, if important to the problem, lies, it seems, in counsel's own statement in its "Reply to the Brief Filed on Behalf of Defendant Continental Oil Company," pp. 8, 9, filed in the course of the trial. Government counsel there said:

"When the Leasing Act was passed the custom was practically universal in the industry for oil producers to dispose of their crude oil by selling it under contract to a purchasing company and this is still the usual procedure. With this fact in view the leases as originally drafted required the lessees to *file* with the Secretary copies of *all sales contracts* and prohibited the lessees, *in case royalties were being taken in money,* from disposing of the products except in accordance with a sales contract or other method approved by the Secretary. When note is taken of the fact that the power to approve or disapprove contracts is reserved to the Secretary only in the event royalties are being taken in value it is perfectly obvious that the main if not the only purpose of reserving this inspection and approval power was to enable the Secretary to protect the interests of the government in the value of its royalties, and, in view of the manner in which crude oil is handled and disposed of, it is also evident that the protection thus afforded by *section 2(d) is an adequate protection in so far as it applies to crude oil.* As the Secretary soon found out, however, the language of section 2(d) was not well designed to protect the government's royalty interests in various disposals of natural gas which were commonly being made by its lessees.

"When the leasing act was passed the value of natural gas as a source of reservoir energy was not well understood and many operators, being primarily interested in obtaining a quick revenue from oil, regarded gas a nuisance to be gotten rid of by simply releasing it into the air. Many billions of cubic feet have been dissipated in this fashion. Immense amounts of gas have also been burned for the unjustifiable and uneconomic purpose of making carbon black. Some operators also have made a show of utilization by reinjecting gas into depleted sands without any assurance that any appreciable percentage of such stored gas could thereafter be recovered. In some cases some or all of the gasoline content of gas disposed of by the foregoing methods was first extracted and in some cases not. Such methods of disposal were not ordinarily covered or susceptible of being covered by sales contracts, or otherwise governed by stipulations having any bearing whatever on the question of value. It follows that, in so far as gas and gasoline were concerned, the language of section 2(d) was quite inadequate. It is no wonder then that the Secretary, after some experience in administering the Act, sought to remedy this defect by adding section 2 (c) (3) to his original draft and by such addition making it perfectly plain that the power to determine royalty valuations would be exercised whether or not a sales contract or other method were submitted for his approval." (Emphasis added only as to the statement that "section 2 (d) is an adequate protection in so far as it applied to crude oil.")

59 App.D.C. 275, 40 F.2d 787,[19] certiorari denied 282 U.S. 843, 51 S.Ct. 24, 75 L.Ed. 748. He chose, instead, to withhold a formal ruling on those contracts until 1938,[20] and to assert an independent right to fix the value.

Plaintiff contends also that the right to fix the value of oil was reserved by an amendment to section 1-h of the 1926 regulations adopted in January, 1931. By section 1-h of the 1926 regulations, it will be recalled, the Secretary directed the supervisor to *compute* and report the value of accrued royalties on oil and gas. By the amendment of January, 1931, the supervisor was directed to *determine* the value of such royalties. The power to "determine" the value of royalties, plaintiff says, gave the right here asserted.

It is, to say the least, questionable whether the lessees are bound by this amendment which came long after many of the leases were executed.[21] Without discussing that question, it is apparent to the court that the amendment, even if binding on the lessees, has not the force which the plaintiff would assign to it. Section 1-h as originally promulgated was mainly of departmental concern between the Secretary and his supervisor. Section 1-h as amended has no greater significance so far as the lessees are concerned. Even if it may be said that the change in terminology from "compute" to "determine" changes the responsibility of the supervisor, it still regulates his duties as agent of the Secretary. It does not affect the obligations of the lessees nor the authority of the Secretary over them. If the parties had intended that it should affect the contracts so that it gave the Secretary the right to fix the value of oil—admittedly an extreme power,—it seems reasona-

---

[19] In the Texas Company case the court said at pages 789, 790 of 40 F.2d: "Moreover, the construction placed upon the act by the Secretary of the Interior [i. e. to require submission of contracts and to reserve the right of disapproval of same, etc.] is not unreasonable, for it enables the government to prevent a *'chilling'* of the market price of oil produced in the Oregon Basin field, *such as might reduce the amount of the royalties received* by the government when taken 'in value,' * * *. These considerations are not foreign to the legislative purposes expressed by section 32 of the act. * * * And we are of the opinion that under all the circumstances the courts should not interfere with the exercise of the authority claimed by the Secretary." (Emphasis added.)

Defendants have attacked this ruling in the Texas Company case as "dictum". In this court's opinion such attack is unwarranted. The decision rests on two bases, of which the *first* and strongly-advanced basis, is the one here in question. Thus the language of the cases hereinafter cited is apposite and conclusive: United States v. Title Insurance Co., 265 U.S. 472, 486, 44 S.Ct. 621, 623, 68 L.Ed. 1110: "But it is urged that what we have described as ruled there was obiter dictum, and should be disregarded, because the court there gave a second ground for its decision, which was broad enough to sustain it independently of the first ground. The premise of the contention is right, but the conclusion is wrong; for where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, 'the ruling on neither is obiter, but each is the judgment of the court, and of equal validity with the other.' Union Pac. R. Co. v. Mason City & Fort Dodge R. Co., 199 U.S. 160, 166, 26 S.Ct. 19, 20 (50 L.Ed. 134); Railroad Cos. v. Schutte, 103 U.S. 118, 143, 26 L.Ed. 327." In the last-cited case (103 U.S. 118, 143, 26 L.Ed. 327), it was held that "It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter."

[20] This ruling is discussed hereinafter.

[21] There was spirited opposition on the part of defendants to the government's attempt to read into the unit agreement an undertaking by the lessees to be bound by section 1-h was amended in 1931. The agreement provided (Sec. IV (1) ) that "The Association shall develop and operate the lands and deposits affected by this agreement and dispose of the products allocated to the government acreage in conformity with the operating regulations * * * as amended prior to the effective date of this agreement * * *." The court deems it unnecessary to pass on the applicability of this section of the agreement. The lessees argued that the above-quoted provision did not deal with royalties; also that it did not affect the lessees; that it was an undertaking by Kenda alone, and not by the lessees.

ble to conclude that they would in terms have included it in the leases or that they would have made the implication clear and positive. Neither was done. The amendment to section 1-h cannot be interpreted so as to accomplish the drastic change for which the plaintiff contends.

The court concludes that the authority claimed by the Secretary of the Interior over oil-royalty valuations, although honestly asserted by him, was not properly asserted over the defendant lessees. The court therefore answers the question contained in issue one of the pre-trial order as regards oil, in the negative. There is then left for the court issue three of such pretrial order, that is, what was the reasonable value of oil for the period in question?

Before the court may consider the question last stated, it must, in view of the contentions of the parties, determine whether or not the posted prices truly reflect reasonable market value. If they do, then defendants have properly accounted for plaintiff's oil royalties. Plaintiff contends vigorously that they do not, and asserts and assumes the burden of proving that there was absent in the period in question a competitive, open market for crude oil at Kettleman Hills.

### The Market at Kettleman Hills

When oil was discovered in Kettleman Hills it was the kind known as light oil; it was generally designated as "white" oil, and was of a very high gravity. Within the period of its production this white oil has varied from 55 to 64 degrees of gravity. The volume of its production was small compared with the "black" oil, which was first obtained at Kettleman in 1930. The black oil's gravity range was from 33 to 40 gravity.

From July 1, 1931, to July 1, 1939, the integrated defendants, by reason of ownership of the properties or by means of operating rights, directly controlled the disposition of more than sixty per cent of the Kettleman Hills production. Through subsidiary or affiliated companies and through contractual arrangements, they have at various times within the period controlled ad-

ditional portions of the remainder of the field's output. The General Petroleum Corporation, a subsidiary of Socony-Vacuum Corporation, had purchased from Coast Land Company the oil production from 2460 acres of Kettleman Hills land. This right on the part of General was to continue during the life of production. It owned 340 acres, and had government leases for 2160 acres, thus giving it a control of 4960 acres. Standard Oil Company of California had 200 acres of government land under lease and owned 9460 acres. Thus these two integrated companies, General Petroleum and Standard, controlled 14,620 acres out of the field's estimated 21,200 acres of productive oil land.

There are six pipe lines in Kettleman Hills used for transporting oil from the field to the refineries. Since July 1, 1931, each of the integrated defendants, General, Standard, Shell, Associated and Union, has owned and operated such a line. The Valley Pipeline Company built a line from Kettleman Hills and has operated it since August 12, 1936. Seaboard and Texas each own one-half of the stock of the Valley Pipeline Company.

With one exception—to Estero Bay—there has been no pipe line rate filed for the transportation of oil from Kettleman Hills. Estero Bay is practically inaccessible to most of the independent refiners of California. Although designated as common carriers, none of the pipe lines actually has ever operated as such. And it may be added that the evidence does not disclose that anyone has ever demanded the right so to use such pipe lines.

It should be kept in mind that at all times since the discovery of oil at Kettleman Hills the integrated defendants (with two exceptions)[22] operating in the field have been buyers—not sellers—of crude oil. Standard, General, Union and Associated posted in the field, prices at which they would be willing to buy oil. Their purchases of crude oil were made on the basis of such prices.[23] Shell, while not posting prices, purchased oil at the same prices paid

---

[22] General Petroleum Corporation in selling Coast Land Oil in 1928. Shell Oil Company sold a limited amount of oil in 1935.

[23] The price-posting companies announced that all oil in a field above the highest gravity for which a price was posted would be purchased at the high-

by the others, that is, at the posted prices established by the other integrated defendants.

The plaintiff calls to the attention of the court the action in 1928 of Standard Oil Company of California and General Petroleum Corporation with regard to the price to be paid for the oil produced from the Coast Land Company properties. It argues that this action is indicative of a controlled and not an open market.

The price at which General purchased the oil of the Coast Land Company was specified in its contract as that posted by the Standard Oil Company of California for oil of like character and gravity. Marland Oil Company (subsequently Continental) and Milham Exploration Company (subsequently Seaboard) became the successors of Coast Land Company. In October of 1928 a well producing 55 gravity oil was "brought in" by Milham. This oil was subject to the General-Coast Land contract. At the time this well was placed in production the Standard had posted no price for such high-gravity oil. On November 8, 1928, General advised Marland in writing that it had established a price of $1.65 a barrel, stating that "this price structure has been arrived at by stepping up the Coalinga price 4¢ for each degree of gravity, with a maximum of $1.65 * * * (or in other words) with the price of 44 gravity oil as the maximum." Marland and Milham refused to accept this as a proper basis of payment. After this refusal, on December 15, 1928, General sold to Standard for one year all oil of 55 gravity, or higher, which General had contracted to buy from Marland at Kettleman, being the oil hereinbefore mentioned. The price agreed upon was designated as that currently offered by Standard to other producers, for like oil (although at that time Standard had not posted prices covering this gravity), that price

being stated as $1.65 per barrel. On January 18, 1929, Standard posted a price for 55 (and over) gravity oil of $1.65 at Kettleman Hills. Marland and Milham thereafter accepted the $1.65 price for their oil. General delivered this oil to Standard, and it was transported from Kettleman Hills field by General's newly-completed pipe line, then under lease to Standard. During this period (1928 and the early part of 1929) General and Standard were the only purchasing companies in the Kettleman Hills field.

It may be noted that the attempted establishment of a price by General to cover the Coast Land Company contract was apparently one of unilateral decision. It was what General offered to pay on an increase of the price paid for oil from the Coalinga field, but not for oil of a higher gravity than 44 degrees. In other words, it stopped the "stepping up" process and of its own accord crystallized the price at that which it would pay for 44 gravity oil, although the oil which it would take was at least eleven degrees higher gravity.

While the Standard-General contract of purchase provided that the $1.65 price might be changed,[24] it does not appear that it was changed. Thus the price which General had attempted to establish by its own action, as above indicated, was the same as the price posted by Standard for the year, the term of the General-Standard contract. Such price ($1.65) continued until sometime in the earlier part of the year 1931. (The price posted for 42 gravity oil in another California field within this period was as high as $2.20 a barrel.) After two years or more of operation under the Coast Land contract, such contract was canceled as to the Milham properties.[25] As to the Marland properties it was also canceled, after Marland's successor, Continental, had contracted to sell its oil production from the

est price posted. For example, if 39 gravity is the highest gravity for which a posting is made, then the oil, if any, of a higher gravity offered for sale in the same field would carry the same price as that posted for 39 gravity.

[24] There was a provision that in the event Standard's posted prices advanced beyond $1.65 per barrel, General should be entitled to such advance; that if post-

ed prices dropped below $1.65, General could offer to sell at such lower price or reject it, in which event the contract would be terminated.

[25] Milham lands were released from the terms of the Coast Land contract December 31, 1930. A certain part of Marland's property was released February 17, 1931, and all remaining thereof by agreements dated March 24, 1931,

Marland properties for three years to General at General's posted prices. Under such contract General was not required to accept deliveries of more than 450,000 barrels of oil in any one month or more than 20,000 barrels in any one day, but could accept a greater amount at its option.

The plaintiff-lessor did not accept the $1.65 price for its high-gravity oil from the foregoing property. It took its share of the oil for the year of April 1, 1929, to April 1, 1930, in kind and sold it to the Phillips Petroleum Company for $2.25 per barrel, a portion bringing $2.54 per barrel. Later this was purchased by Standard at a still higher figure. Plaintiff's oil so sold amounted approximately to 36,500 barrels for the year.[26]

The plaintiff particularly stresses the fact that throughout the period in question (July 1, 1931, to July 1, 1939), with the exception of a period of five days (October 26—November 1, 1935), the prices posted in Kettleman Hills field by the various price-posting companies have been identical. Uniformity of price may be the result of competition. On the other hand it may result from lack of competition. In any event it may be considered with other evidence in determining whether the prices prevailing in a market reflected true market value or whether they were artificial and not the result of supply and demand. Each case must be judged on its own facts.

The Secretary of the Interior in his order of June 4, 1931, relating to payment for the lessor's share of the oil from the leased property, designated gravity as the basis for the determination of the prices for crude oil, and the plaintiff now contends that gravity is proper for the *ascertainment of value*. The defendants reply that this is the wrong criterion to employ; that it is unfair to them to do so, as Kettleman Hills oil of a given gravity is not as valuable as that of oil of the same gravity in some other fields in California. Extended argument has been made by the various parties upon this point. A great deal appears in the briefs as to the constituents of crude oil and their importance in determining the value of the oil. From the evidence it appears that gravity alone is not always sufficient for ascertainment of value. While it may be true that the criterion of gravity is satisfactory for such purpose in the *same* field, it seldom appears that such is the case between *different* fields in California. As contended for by defendants, oil of a given gravity may be lower in "quality" content in one field than in another and as a result not be so valuable as that of a lower gravity in another field. Such is the testimony of William L. Stewart, vice president of Union. It clearly appears from certain computations introduced into evidence in connection with the testimony by deposition of William G. McCammon, an employee of Standard of California, that value does not necessarily depend upon gravity. The following data as to gravities and valuations demonstrate this:

### TABLE A

(Prepared from Plaintiff's Ex. 63-j)

"*Schedule Effective March 5, 1933*"

| | A.P.I. Gravity | Values—$/Bbl. of Crude Total |
| --- | --- | --- |
| ATHENS-ROSECRANS | 24 | .772 |
| | 25 | .797 |
| | 26 | .823 |
| SIGNAL HILL | 24 | .812 |
| | 25 | .832 |
| | 26 | .852 |
| HUNTINGTON BEACH | 24 | .838 |
| | 25 | .857 |
| | 26 | .875 |
| KETTLEMAN HILLS | 33 | .960 |
| SANTE FE SPRINGS | 33 | .972 |
| ELWOOD TERRACE | 33 | 1.007 |
| MIDWAY-SUNSET | 33 | 1.098 |

and April 1, 1931. General entered into a new contract (March 24, 1931) to buy the oil from Continental (Marland property) for a period of three years. The agreement of October 8, 1923, was canceled April 1, 1931.

[26] General points out that this was a comparatively small volume.

The chief features of crude oil are its gasoline quality and fuel-oil quality, according to the testimony of an official of one of the integrated defendants.

"End point", as explained by McCammon, is the point where complete distillation occurs.[27] The percentage of end-point stock present appears to be of major importance in determining quality and value of the higher-gravity crude oils.[28] The residuum is likewise a factor, but less important.

The computations hereinbefore mentioned were made by the employees of Standard concerning valuations of oil in various California fields. These appear as exhibits (Plaintiff's 63-a to 63-l). Reference will be made to parts thereof.[29] The court has selected for such reference oils which are substantially the same in percentage of end-point stock and residuum.[30] They are as follows:

It is to be observed from the foregoing table that these oils of different degrees of gravity, but of substantially the same end-point content, have a "total value" rating which is comparable. They do not, however, have the same net value. The difference in these "value" items is accounted for by the difference in transportation costs. This transportation differential will also account for the quotation of a ten-cent lower posted price at Midway-Sunset than at Santa Fe Springs. It costs more to carry the oil from Midway-Sunset to the refinery than it does to convey it from Santa Fe Springs to the refinery. This difference in transportation does not, however, account for the posting of a price of 79 cents at Midway-Sunset and 72 cents at Kettleman Hills, where the manufacturing and transportation costs are the same in each field, it being noted that the net of the former is 79 cents while that of the latter is 80 cents per barrel.

TABLE B

(Prepared from Plaintiff's Ex. 63-j)

"Schedule Effective March 5, 1933"

| | | Yields | | | | Values—$/Bbl. of Crude | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A.P.I. Gravity | % E.P. stock | 437 Resid-uum | 437 E.P. stock | Resid-uum | Total | Deduct. mfg. transp. | Net comp. at well | Posted at well |
| SANTA FE SPRINGS | 35 | 42.2 | 57.3 | $.676 | .344 | 1.020 | .123 | .897 | .90 |
| MIDWAY-SUNSET | 30 | 41.8 | 57.7 | .669 | .346 | 1.015 | .223 | .792 | .79 |
| KETTLE-MAN HILLS | 36 | 42.8 | 56.7 | .685 | .340 | 1.025 | .223 | .802 | .72 |

[27] Webster defines end point as the "temperature at which liquid ceases to distill over."

[28] Referring to the higher gravities of the so-called "black" oil.

[29] It would seem that the valuations are an excellent index of quality and should be of aid to the court, provided the computations are competent evidence. This is a controverted question, and will be referred to later herein.

[30] In some instances an end point stock of 400 degrees Fahrenheit was used as a basis of computation; in others, 410 degrees, and in some 437 degrees. The differences in end-point value do not seem to be material for the purposes with which the court is presently concerned. The comparisons of valuation are made from one schedule at a time, and in each schedule so used the end-point value figures are the same. There was a higher end point value given in some instances for the San Joaquin Valley fields, but these were noted on the sheets containing the computations, and such computations were not used by the court in making comparisons.

A further observation of this schedule will show that the "net value" at Santa Fe Springs and Midway-Sunset becomes in round numbers the posted price. This practice of converting net value into posted prices is shown by the computations to have prevailed generally in the fields in the Los Angeles Basin. (There are some instances in which this did not occur, but it is substantially true for the years 1931–1935.)

It is important to note, however, that the substantial translation of the net value of the oil at the well into posted prices is not made in the Kettleman Hills field. There the posted price is eight cents below the net computed at the well. Such decrease is without satisfactory explanation either in the deposition or in any other part of the evidence. This is an apparent discrimination against Kettleman Hills oil. As illustrative of such discrimination, reference is made to the figures appearing on exhibit 63-j under the headings "Net Computed at the Well" and "Posted at the Well", for all gravities of oil for which prices were posted. They are as follows:

### TABLE C

| | A.P.I. Gravity | Net Computed at Well | Posted at well |
|---|---|---|---|
| KETTLEMAN | 33 | .738 | .66 |
| HILLS | 34 | .759 | .68 |
| | 35 | .780 | .70 |
| | 36 | .802 | .72 |
| | 37 | .824 | .74 |
| | 38 | .847 | .76 |
| | 39 | .869 | .78 |

On June 26, 1933, the schedule of prices shows that there was a substantial increase in posted prices throughout the California fields. Likewise there was a corresponding increase in "total value" and of the net computed at the well in the three fields last mentioned (Santa Fe Springs, Midway-Sunset, and Kettleman Hills), the cost of manufacturing and transportation remaining the same as that of March 5, 1933 (Table B). Such figures are shown as follows:

### TABLE D

#### (Exhibit 63-i)

#### "Schedule Effective June 26, 1933"

| Yields | | | | Values—$/Bbl. of Crude | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | A.P.I. Gravity | % 437 E.P. stock | Residuum | 437 E.P. stock | Residuum | Total | Deduct. transp. mfg. | Net Comp. at well | Posted at well |
| SANTE FE SPRINGS | 35 | 42.2 | 57.3 | .830 | .344 | 1.174 | .123 | 1.051 | 1.05 |
| MIDWAY-SUNSET | 30 | 41.8 | 57.7 | .822 | .346 | 1.168 | .223 | .945 | .95 |
| KETTLEMAN HILLS | 36 | 42.8 | 56.7 | .842 | .340 | 1.182 | .223 | .959 | .82 |

It is to be observed that with a net value of $1.051 at the well at Santa Fe Springs the posted price is $1.05; at Midway-Sunset the net value is 94.5 cents and the posted price 95 cents, while at Kettleman Hills, with a net of 95.9 cents the posted price is 82 cents.

A further example of the failure to follow the general practice [31] of translating the net prices computed at the well into the prices posted at the well in the Kettleman field is shown in the last-mentioned schedule by the following:

The McCammon deposition does not cover this period as to Kettleman Hills production, but other information in the record will serve as a basis for certain conclusions relative to comparative valuations.

The Standard computations show gener-

TABLE E

*(Prepared from Plaintiff's Ex. 63-i)*

| | A.P.I. Gravity | Net Computed at Well | Posted at well |
|---|---|---|---|
| KETTLEMAN | 33 | .869 | .76 |
| HILLS | 34 | .899 | .78 |
| | 35 | .929 | .80 |
| | 36 | .959 | .82 |
| | 37 | .989 | .84 |
| | 38 | 1.019 | .86 |
| | 39 | 1.050 | .88 |

One of the defendants has said that oil does not go to market, but that the market comes to the oil. If this was true during the time the last-mentioned schedule was in effect, then the market came to the wells in Kettleman Hills, found oil which had already been charged with transportation costs to a refinery and had a net value computed at the well. Instead of buying it at such net figure—which appeared to be the general practice in what the defendants claimed were "open" markets in the Los Angeles area—it absorbed all the Kettleman crude at a substantially lower price than the net value so computed.

Plaintiff particularly calls to the attention of the court the prices in effect from June 19, 1931, to January 1, 1932.

ally that 30 degree gravity oil at Midway-Sunset is comparable in valuation to Kettleman Hills thirty-six [32] degree gravity, and that the transportation and manufacturing costs were the same in the two fields. Under the schedule of prices for June 19, 1931—January 1, 1932 (exh. 63-1) the price posted at Midway-Sunset for 30 gravity oil was 76 cents. The Kettleman Hills posted price for all oil, some being as high as 64 gravity, during such period was *66 cents per barrel.* The field *produced more than 900,000 barrels of 40-gravity oil from June 19, 1931, to January 1, 1932.*[33] Inferentially it may be said that the price for the 40 gravity oil consistently should have been somewhat higher than 76 cents per barrel. [34]

[31] As shown on Ex. 63-i, this practice was adhered to in the following California fields: Signal Hill, Huntington Beach, Athens-Rosecrans, Dominguez, Santa Fe Springs, Midway-Sunset, Elk Hills, Buena Vista Hills and Lost Hills. It was not followed in Elwood Terrace. These fields supplied the larger portion of refinable crude oil produced in California in the period involved herein.

[32] In some periods the computations show Kettleman Hills 35 gravity more nearly comparable to Midway-Sunset 30 gravity; in others 36 gravity.

[33] Within the same period there were produced 113,937 barrels of 41-degree gravity crude, 64,308 barrels of 44 grav-

ity, 57,582 barrels of 47 gravity, and 116,380 barrels of 49 gravity.

[34] After January 1, 1932, the prices posted in Kettleman Hills were graduated on a gravity basis (in the "upside down" period of 1935 the scale was downward; otherwise it was upward). This varied from one to four cents for each degree of gravity. For the years 1932, 1933 and 1934 it was two cents, with the exception of a part of 1933, when the advance per degree of gravity was three cents. Had a similarly-graduated (2¢ per degree) scale of price posting been adopted for the earlier 1931–1932 period, instead of the flat 66 cent quotation for all gravities, and

The court in the foregoing analyses has used the Midway-Sunset field as a basis of comparison with the Kettleman Hills field. [35] It is of the opinion that the propriety of such comparison is supported by the evidence. "Midway-Sunset" contains not only the oil-producing Midway-Sunset field, but as well the oil fields of Elk Hills and Buena Vista Hills. Both Kettleman Hills and Midway-Sunset are within the San Joaquin Valley, one of the large California valleys; they are approximately 60 miles apart, and generally have the same physical characteristics; the oil produced from each field was transported by pipe lines, or by pipe lines and sea-going tankers, to the same areas for refining. The refining centers were at San Francisco Bay and in the Los Angeles Basin. The costs of manufacturing and transportation shown on the price schedules considered in the analyses were identical.

■ Was Midway-Sunset an open market? Assuredly the integrated defendants cannot say that it was not. They posted prices at which they would be willing to purchase oil produced there, and the oil they bought was acquired at such prices.

From a study of the computations in the schedules used hereinbefore, it appears that the prices for comparable oils (end point stock and residuum) were substantially the same at Midway-Sunset as in fields in the Los Angeles Basin, after the deduction of the difference in transportation costs. The court has already referred to the figures for 35 gravity oil from Santa Fe Springs, and 30 gravity oil produced at Midway-Sunset, appearing on the "price schedule" for March 5, 1933. The cost of manufacturing and transportation was ten cents lower at Santa Fe Springs than at Midway-Sunset, and the price posted was accordingly ten cents higher at Santa Fe Springs than at Midway-Sunset.

This transportation and posted-price differential was generally reflected in the schedules for 1931 and 1932, e. g., on the schedule of June 19, 1931, for 35 gravity Santa Fe Springs oil and 30 gravity Midway-Sunset oil, with comparable end-point and residuum contents, there was a difference of 10.2 cents in the item of "manufacturing and transportation", and 11 cents difference in posted prices.

On the last-mentioned schedule are given the figures for 27 gravity oil at Signal Hills, 26 gravity at Huntington Beach, 30 gravity at Santa Fe Springs and 25 gravity at Midway-Sunset. All have substantially the same end-point and residuum contents and "total value." Manufacturing and transportation costs for Signal Hill, Huntington Beach and Santa Fe Springs are substantially the same, and these costs are ten cents lower than such costs at Midway-Sunset. The posted prices at the first three are the same, and they are accordingly ten cents higher than at Midway-Sunset. [36]

---

assuming that the integrated defendants believed that the price of 66 cents was a fair one for 33 gravity oil, then, upon the basis of a two-cent increase per degree of gravity above 33 degrees, the posted price for the 1931–32 period would have been 80 cents for 40 gravity oil, instead of the sixty-six cent price which was established.

Assuming on the basis of end-point and residuum content, that 36 gravity (see note 32) Kettleman oil was as valuable as 30 gravity Midway-Sunset oil, and with the cost of transportation and manufacturing the same in each field, 36 gravity should have commanded a price of 76 cents in 1931–32, the Midway-Sunset price for 30 gravity. With an advance of 2 cents per degree increase in gravity, for 40 grav-

ity oil the posted price would have been 84 cents. It was actually 66 cents.

[35] The oils of Midway-Sunset and Kettleman Hills will be referred to as comparable. "Comparable" is defined in Webster's New International Dictionary as: Capable of being compared (with); worthy of comparison (to). Webster's Dictionary of Synonyms states that things are comparable when they bear sufficient likeness to each other in one or more important respects to admit of a useful or fitting comparison.

[36] Schedules of prices disclose that the same differential-posted prices as related to manufacturing and transportation costs—obtained not only between the Los Angeles fields and Midway-Sunset, but as well among the various Los

From the foregoing it seems clear that there was no substantial difference in the treatment of the comparable oils in the Los Angeles area and those at Mid-way-Sunset, with reference to valuation. [37] While plaintiff does not concede in terms that the Los Angeles area constituted a competitive, open market, it admits that it was as nearly so as could be found in California. The court is of the opinion then that for all practical purposes it is reasonable to conclude that consideration may be given to comparable oils at Mid-way-Sunset and Kettleman Hills in order to determine whether the posted prices at the latter represented true market value in a competitive, open market. [38]

In reaching the conclusion, which it is quite obvious at this point the court has reached, that there was a discrimination against Kettleman Hills in posting prices for crude oil when compared with prices at Midway-Sunset, it is not necessary for the court to rely entirely upon the computations referred to, or upon the deposition of Mc-Cammon. Other evidence indicates this, but not as definitely as the computations. It may be remembered that W. C. Menden-hall, who, at the request of the Secretary of the Interior, reported on the conditions prevailing at Kettleman Hills in 1931, though not having the benefit of all the data presented to the court herein,[39] came to the same conclusion substantially as that of the court relative to the comparison of the prices of the two fields. He said in his report to the Secretary: "It is of interest to note that, as shown in this tabulation (table 6 of his report) that Kettleman Hills oil produced in the same general area as Angeles fields designated thereon. The following table shows this:

(Prepared from Plaintiff's exh. 63–1)

*"Schedule Effective June 19, 1931"*

| | A.P.I. Gravity | % 410 E.P. Stock | Resid-uum | 410 E.P. Stock | Resid-uum | Total | Deduct. mfg. trans. | Net comp. at well | Posted at well |
|---|---|---|---|---|---|---|---|---|---|
| SIGNAL HILL | 27 | 25.0 | 75 | .430 | .450 | .880 | .130 | .750 | .75 |
| HUNTINGTON BEACH | 26 | 24.5 | 75.5 | .421 | .453 | .874 | .129 | .745 | .74 |
| SANTA FE | 30 | 25.7 | 74.3 | .442 | .446 | .888 | .132 | .756 | .75 |
| MIDWAY | 25 | 25.1 | 74.9 | .432 | .449 | .881 | .230 | .651 | .64 |

portation differential and are probably based in a general way on refinery re-

[37] Not always, as shown in the computations, does the action appear consistent; that is to say that there are some variations—in most instances slight —from the pattern above outlined.

[38] The same observation may be made as to comparable oils in other California fields, particularly as to Santa Fe Springs, when consideration is given to the difference in transportation costs.

[39] (The Mendenhall Report, p. 8): "Table 4 also indicates that Kettleman Hills crude oil is in direct competition with other representative California fields, as evidenced by the fact that oil from these fields is shipped to the same refining centers. In the petroleum industry it has long been the general custom of purchasing companies to quote or post prices for crude oil on a gravity basis. It is recognized that gravity alone is not always an adequate index of value and that posted prices normally take into account a measure of trans-coveries or value of refined products in the market, but details of this information are seldom, if ever, divulged to the public by the refiner. Survey representatives could not obtain from refineries using Kettleman Hills oil, even from refineries owned by appellants in this cause, any information as to relative values of Kettleman Hills and other California crudes from refinery realization statistics. For the purposes of this report, therefore, it is assumed that gravity alone is a fair index of relative value. This assumption is substantially confirmed by the practical uniformity of prices on a gravity basis for fields of the Los Angeles district when transportation differentials are taken into consideration. The burden of proof as to any other basis for comparison of values must rest upon those interested parties who have so far refused to divulge trustworthy information on refinery realization."

oil in other San Joaquin Valley fields is, on the basis of prices posted for 33 gravity, priced $0.10 a barrel lower than 30 degrees A.P.I. gravity oil produced in surrounding fields." A reference to table 6 shows that "other San Joaquin Valley fields" included the Midway-Sunset group of oil fields.

To summarize: when the court considers that the integrated defendants posted prices at which they would buy oil at Kettleman, or appeared from the evidence to be governed in their purchases by prices posted by other integrated defendants, which prices are identical, and that such prices, month after month for years, are substantially lower than those posted in a nearby field (Midway-Sunset) for comparable oil which is subject to the same costs of manufacturing and transportation, then it believes that the conclusion is inescapable that there was an artificial market at Kettleman Hills, and that this was to the detriment of sellers of crude oil in such market.

Defendants have sought to minimize the effect of McCammon's testimony. They claim, among other things, that he was unfamiliar with the subject matter of his deposition. Generally speaking, such claim is without merit. (In fact the court was more impressed by the knowledge of McCammon and of Charles S. Wimpress, assistant to the vice president of Union, than it was by that of some others who testified upon the same subject.)

After the trial had begun, plaintiff notified Standard that it desired to take the deposition of someone who could testify concerning the computations (heretofore referred to), which one of Standard's attorneys had forwarded by letter to one of plaintiff's attorneys. McCammon was designated by Standard for such purpose. The letter is as follows:

"December 29, 1941.
"Mr. F. B. Critchlow,
"Special Assistant to the Attorney General,
"Federal Building,
"Los Angeles, California.
"Dear Mr. Critchlow:

"Pursuant to our verbal understanding in connection with the proposed depositions of Mr. H. D. Collier,[40] Mr. A. S. Russell and Mr. B. W. Letcher, I am sending you herewith compilations with reference to crude oil and natural gasoline prices of Standard Oil Company of California prepared along the line of that furnished to you by Union Oil Company.

"As Mr. Felix T. Smith has told you, Standard's field prices were determined by its executives in light of a variety of different factors not susceptible of expression or use as formulae or bases. *The computations reflected in the enclosed were made by employees of the company and submitted to said executives in advance of the determination of such prices.* However, since such determination was, in the last analysis, always the result of the exercise of the judgment of said executives, the computations so submitted to them were deemed but suggestions which the executives were free to adopt, modify, or reject in the light of all other considerations entering into the exercise of their judgment. In furnishing the enclosed information, therefore, Standard Oil Company of California would like you to understand that it does not represent or concede that such information, in fact, sets out formulae or bases on which its field prices were determined, or that the same is responsive to paragraphs 3 or 14 of the order for production and inspection, or that the enclosed or the information therein contained is admissible in evidence for any purpose, and that it reserves the right to object to the admissibility thereof.

"Respectfully yours,
"Max Felix." (Emphasis added.)

The court refers particularly to the foregoing for the reason that it has largely used the computations for the purpose of making its valuation comparisons. While the Standard executives did not have the actual sheets which were received as exhibits, evidently they did have the computations contained thereon. The fact that these figures were submitted to the executives before determination of posted prices does not depend upon McCammon's testimony; nor is the fact that these executives had the computations before them (even though they were deemed suggestions only)

---

[40] President of Standard.

*in exercising their judgment in determining posted prices,* contingent upon his evidence. These facts are clear from the letter, which was written many months before McCammon gave his deposition.

No reservation or objection militates against the effect of the emphasized sentence in the above-mentioned letter, either when considered alone or with the context. The letter was, moreover, marked as an exhibit for identification at Standard's request at the taking of the deposition, and in the course of the trial was read into the record.[41]

It seems fair to conclude that the Standard executives, year after year, would not have considered such computations, even as suggestions, if they were inaccurate. And it is not reasonable to believe that the executives of other integrated defendants who followed the Standard's prices would pay out millions of dollars for oil purchased by their companies, if they did not know of, or believe in, the accuracy of Standard's conclusions. At least it may be inferred that they believed that their companies, as buyers, were fully protected by the Standard's figures. These defendants possessed, or could obtain, all data through their own research which were in the possession of Standard.

It may be added, also, that whatever action was taken by Standard's executives in adopting, modifying, or rejecting the suggestions contained in the computations, the result was that the posted prices as shown by other evidence, were the same as those set out in the computations.

McCammon testified that crude oil under the Standard method of computation was divided into two parts, end-point percentage and residuum. Some argument is made that this is not the same as that of Union and General, which employ a three-product method, i. e., a further division of the residuum into a fuel oil and gas oil. It would seem that this is not important as far as it relates to final valuations. Whatever calculations were made by the companies other than Standard, the results were the same as Standard's. They all ended with the same posted prices.

Mr. Dickey, president of General Petroleum, said: " * * * as I told you before, in every case that I was conversant with the procedure was that we followed the price schedules as posted by principal purchasers of crude in California, and that I had no knowledge of any instance when we deviated from that." And later: "I know of no schedules that I have been instrumental in looking over that have been prepared otherwise than following the price schedule as set by some other principal purchasers." Mr. Dickey stated that in some instances the General followed Standard and in others, Union.

C. S. Wimpress, assistant to vice-president Stewart of the Union Oil Company, was examined as to the basis of certain of Union's schedules of posted prices at Kettleman Hills. In part his testimony was as follows:

"Q. [What was the basis of Union's schedule of] June 20, 1931? A. That was

---

[41] "Q. I hand you, Mr. McCammon, these three sheets so marked, and so entitled, and ask you whether you had anything to do with the preparation of those documents?

"Mr. Hall: Before you answer, Mr. McCammon—if the witness is to be examined on these sheets the letter which accompanied the sheets to Government counsel should also be produced and marked. That letter was as much a part of the sheets as the caption on the sheets, and it is obviously improper to examine the witness on a fragmentary document. You know the letter I refer to, don't you, Mr. Critchlow?

"Mr. Critchlow: You refer to a letter written by Mr. Felix?

"Mr. Hall: Letter dated December 29, 1941, written to you by Mr. Felix, transmitting those sheets to you."

"Mr. Critchlow: Now, I suggest at this time that that letter, which was subsequently offered by Mr. Hall, be read into the record.

"Would you care to read that, Mr. Hall, or shall I read it? It appears on page 95, I believe, Mr. Hall.

"Mr. Hall: The letter is marked in this deposition as S.O.—Exhibit A, for identification, and omitting the letterhead at the top of the letter, the letter is as follows:"

Then follows Mr. Felix's letter, read by Mr. Hall.

based on Standard's schedule of June 19, 1931.

"Q. May 17, 1932? A. Which schedule is that?

"Q. I think it applies merely to Coalinga. A. That is outside this, isn't it. Isn't that Coalinga heavy?

"Q. It applies just to Coalinga? A. Heavy?

"Q. Well, you look at it. A. Oh, no. That is right. I think Union initiated that schedule.

"Q. Has your company any data showing the factors used as a basis upon which that schedule was prepared? A. No.

"Q. June 26, 1932? A. That is Standard's schedule of June 25, 1932.

"Q. March 5, 1933? A. That is Standard's schedule of March 5, 1933.

"Q. June 26, 1933? A. Standard's schedule of June 26, 1933.

"Q. September 6, 1933? A. That is Standard's schedule of September 6, 1933.

"Q. August 30, 1935? A. Standard's schedule of August 29, 1935."

In reaching its conclusion hereinafter to be noted, the court is not unmindful of the very vigorous argument of defendants that all of the non-integrated defendants sold their oil at the prices posted by the integrated companies; that they accepted such prices without taking advantage of the provisions of section 3(c)[42] of the leases regarding their right to use the pipe line facilities; and that this is conclusive evidence that the posted prices represented reasonable market value or else the non-integrated defendants would have used the pipe lines to transport their oil to other markets. The

court also has in mind the reply of plaintiff to such argument, and in particular the assertion that the larger portion of the "non-integrated" production actually was not sold to the integrated defendants; also that the non-integrated defendants would have to sacrifice certain gravity advantages if there was a mixture of oils in pipe line transportation.

In considering the force of the last-mentioned argument of defendants, it is well to advert to the relationship existing between certain defendants. It has been mentioned herein that there was a contract between Continental and General whereby the former sold to the latter certain quantities of oil to be produced from the former Marland property, beginning April 1, 1931, for a period of three years. Thus this oil[43] was not free from the terms of such contract until the end of March, 1934, and until that time its control resided in General and not Continental.

Likewise, Pacific Western's production was subject to disposition as designated by Kettleman Oil Corporation from March 9, 1929, until 1935 (exh. 205, contract of March 9, 1929), and one-half of the capital stock of such latter corporation was then owned by Standard and one-half by Honolulu.[44]

By contract of October 1, 1931, Belmont transferred to Union an undivided one-half interest in a lease it controlled, Union assuming certain obligations of Belmont. Union thereby was entitled to receive all oil allocated in kind by Kenda to the lands covered by the agreement, with right to sell the same at the current market price. It is obvious that Union would consider its own posted price as the proper market price.

One-half of the capital stock of Kettle-

---

[42] 3(c): "Pipelines to convey at reasonable rates.—The right to require the lessee, his assignees or beneficiary, if owner or operator of, or owner of a controlling interest in, any pipe line, or any company operating the same which may be operated accessible to the oil derived from lands under such lease, to accept and convey at reasonable rates and without discrimination the oil of the Government or of any citizen or company, not the owner of any pipe line, operating a lease or purchasing oil or gas under the provisions of this act."

[43] The amount covered by the contract.

[44] From a date prior to July 1, 1931, and until about June 3, 1932, there were five directors of Kettleman Oil Corporation. Three of the five were directors of Honolulu and the remaining two were directors of Standard. After said date there were six directors of Kettleman Oil Corporation, three being directors of Honolulu and the remaining three directors of Standard. None of the directors of Honolulu was a director of Standard and none of the directors of Standard was a director of Honolulu.

man Inglewood was owned by Standard, and one-half by Honolulu for a portion of the period in question.[45]

Standard of Texas is a wholly-owned subsidiary of Standard of California.

Further opposing the integrated defendants' insistence that the fact that the non-integrated defendants did not ship their oil by pipe line is conclusive evidence of an open market, it may be noted that the Secretary of the Interior, whose duty it was— and one especially imposed upon him by the act in question—to protect the interests of the United States, concluded that the market at Kettleman Hills was not an open market, but was controlled by the integrated defendants, and that as a result the United States was not being paid a price representing true value; that this belief caused him to make the order of June 4, 1931. The Secretary had before him in reaching such conclusion much information presented not only by his own department, but by certain defendants as well. He knew of the Coast Land—General contract and the facts connected therewith heretofore adverted to. He also had, at a later time, the Mendenhall report. Mendenhall, while of the view that the Secretary's order of June 4, 1931, did not attach sufficient importance to the question of transportation costs, was outspoken in his belief that there was no open market at Kettleman Hills.

In the course of the trial and in the briefs, various references were made regarding the holding of the Supreme Court in Maple Flooring Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093, and the companion case of Cement Mfrs' Ass'n v. United States, 268 U.S. 588, 45 S. Ct. 586, 69 L.Ed. 1104. Without attempting to analyze these cases,[46] attention may be called to the very pertinent statement which appeared near the end of the opinion (268 U.S. page 606, 45 S.Ct. 592) in the Cement case. It is as follows: "We realize also that uniformity of price may be the result of agreement .or understanding, and that an *artificial price level* not related to the supply and demand of a given commodity *may be evidence from which such agreement or understanding or some concerted action* of sellers operating to restrain commerce *may be inferred.*" (Emphasis added.)

Months of trial were consumed in presenting evidence upon the single issue of whether or not there was an open market for oil at Kettleman Hills. Necessarily the court cannot well recount herein any considerable portion of such evidence. It would be inadvisable to attempt to do so in this already-long opinion.

The evidence as a whole of facts occurring after July 1, 1931, to the court's mind is clear and convincing that the crude-oil market at Kettleman Hills for the years 1931 (after July 1st), 1932, 1933, 1934, and to August 29, 1935, was not an open market.

For the remainder of the period under consideration, that is, from August 29, 1935, to July 1, 1939, it appears that the disparity between the prices posted for comparable oils in Kettleman Hills and other California fields largely disappeared. The posted prices after said date came into line with the net-computed-at-the-well valuation of crude oil. Hence in such later period the lessees properly accounted for their crude-oil royalties, and plaintiff is not entitled to recover therefor after August 29, 1935.

### Gas and Gasoline

The lease contracts, as hereinbefore indicated, by section 2-c-3 expressly reserved to the Secretary the power to fix the value of gas and gasoline for royalty purposes when those products are not disposed of under approved contracts. Thus, the lessees are bound by the Secretary's determi-

---

[45] Of the six directors of Kettleman Inglewood, three were directors of Honolulu and three were directors of Standard, none of the directors of Honolulu being a director of Standard and none of the directors of Standard being a director of Honolulu.

[46] A comment on the holding in the Maple Flooring and Cement cases was made in the Wholesale Dry Goods Institute v. Fed. Trade Comm., 2 Cir., 139 F.2d 230. There it was said of the Maple Flooring case: "The decision really comes to no more than that a trade association may lawfully exchange general trade information, if in fact that is not a fetch or cover for a combination to control the market."

nation of values of gas and gasoline if the Mineral Leasing Act expressly or impliedly authorized the Secretary to include such section in the leases, and if he validly exercised such reserved power by his orders of June 4, 1931, June 23, 1931, and June 7, 1937.

As to gas and gasoline, the lessees argue chiefly that the Mineral Leasing Act contains no *express* provision authorizing the Secretary to fix the value of royalty products; that such power may not be *implied* since the power claimed by the Secretary is a "price-fixing" power and would render the Act a price-fixing statute. They urge, then, that price-fixing statutes when delegating authority to administrator or board, to be constitutional, must contain definite standards to control the exercise of the delegated authority. Such standard, they say, is lacking here. Finally, they contend that since courts will never so construe a statute as to render it unconstitutional, if they are not compelled to do so, the court will not, in the instant case, read into the Mineral Leasing Act any such implied power.

The authorities which the defendants cite upon the question of requisite standards in statutes are those involving action by the government in its sovereign capacity, that is, where it reaches out to deal with, direct, or regulate the conduct of the citizen; in some instances against the will of the citizen, and often in interference with the citizen's own property or contract rights. Such are the cases of United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L. Ed. 563; Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; United States v. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. There the

law requires strict boundaries to be erected by the statute around the exercise of power by official or board to whom is surrendered so much of the Congressional power as is necessary to fill in the details of the statute enacted. The power assigned to such official or board is administrative in character, not legislative. The safeguards are indispensable lest the administrative officer or board presume upon the Congressional prerogatives to the injury of the citizen.

■ The instant case is, however, not such a case. It involves the construction of a statute which neither purports to direct and regulate the conduct of the citizens by exercise of governmental control over them nor to deal with them against their will. So far as the issue is here concerned, it is a Congressional grant of permission to lease the government's own lands, a direction to the Secretary to negotiate for it and to execute leases in its behalf. It sets the government in business as a proprietor-lessor, creating in the Secretary an agency not to fill in details of a regulatory statute, but to negotiate according to the terms it specifies for the leasing of its land. It authorizes the Secretary to incorporate in those leases "such other provisions as he may deem necessary * * *" (Sec. 30) and "to do any and all things necessary to carry out and accomplish the purposes of this Act." (Sec. 32) Such a statute, to be constitutional does not require that precise and definite standards be incorporated; the safeguards necessary to the regulatory enactments of the sovereign are not required of the proprietor. And even were such standard required to be established in such an act, then, as said in the brief of Standard of Texas and Honolulu Oil, pp. 10-11, "If Congress used 'value' in its accepted sense as meaning 'market value', then it doubtless prescribed a sufficient standard for the Secretary to follow." [47] The court has previously stated that, in its opinion, "value" had such meaning. It further concludes that the term "value" is a sufficient standard.

The defendants also urge that the claimed

[47] And see brief of Standard of California, p. 10: "It is the will of Congress, expressed in the act, that lessees pay royalty on the basis of 'value'. This is the standard."

power to fix value goes beyond the statute in much the same way as the exercises of power condemned in such cases as Curtin v. Benson, 222 U.S. 78, 32 S.Ct. 31, 56 L.Ed. 102; United States v. George, 228 U.S. 14, 33 S.Ct. 412, 57 L.Ed. 712; United States v. United Verde Copper Co., 196 U.S. 207, 25 S.Ct. 222, 49 L.Ed. 449; Hemmer v. United States, 8 Cir., 204 F. 898; United States v. McMurray, C. C., 181 F. 723; United States v. Missouri-Kansas-Texas R. Co., 10 Cir., 66 F.2d 919; and United States v. Eastern Coal & Min. Co., 10 Cir., 66 F.2d 923. They argue that as permittees who satisfied the preliminary requirements laid down in the statute, they were entitled, as a matter of right, to leases in the terms of the Act; that the leases which were forthcoming, insofar as they contained the reservation of power in the Secretary to fix values, were violative of that right; that they are accordingly not bound by such invalid reservation of power.

 It is the court's view that this position is untenable and the last-cited authorities inapposite. Section 2-c-3 did not purport to add to the leases conditions unspecified in the Act, nor did it change or alter the requirements of the Act. Thus United States v. United Verde Copper Co., Hemmer v. United States, United States v. McMurray, United States v. Missouri-Kansas-Texas R. Co., and United States v. Eastern Coal & Mining Co., supra, do not control. The "value" of natural gas and natural-gas gasoline was not, at the time the Act was passed and the leases drawn, necessarily susceptible of determination by reference to contracts or other methods of disposal. Indeed, according to the testimony of Raymond Wheeler for General Petroleum, there was no general prevailing market price for gas during any of the period from 1931 to 1939.[48] In such circumstances, the Secretary was justified, even compelled by the responsibilities of the agency created in him, to establish some method for determining that value. This he did, first by sections 2(s) and 4(c) and (d)[49] of the regulations of 1926; that is, through section

2(s) requiring filing of contracts of disposal of royalty products and forbidding disposal except in accordance with a contract thus approved, and section 4(c) and (d), requiring that the gas and gasoline royalties should be a specified percentage of the value of those products "as fixed by the Secretary," and secondly, in the leases subsequently executed, by section 2-d, incorporating the regulation section 2(s), and 2-c-3, reflecting in part the regulation section 4(c) and (d). It has been noted that the right to require the filing of contracts, and the correlative right to forbid disposal in absence of an approved contract, were upheld in Wilbur v. Texas Co., supra, and it cannot be said that the reserved power to fix the value of products not disposed of under an approved contract stands on a different footing. Both appear designed to ensure that the royalty requirements of the act will be met; both were within the Secretary's authority under the circumstances; both were reasonably incorporated in the leases to effectuate the statutory purposes, and both were accepted by the lessees.

The defendants, however, urge that even if the power was reserved, it may be exercised under the leases only upon a showing that the products were not disposed of under approved contracts; that such showing is a condition precedent which was not here satisfied.

The record discloses that, in accordance with section 2-d of the leases, the lessees in the 1931–39 period duly filed with the Secretary copies of their contracts for the disposition of gas and gasoline. The Secretary did not formally rule on these contracts until early in 1939, when, in substance, he ruled as to each such contract that "The contract and agreements * * * were approved except as to those features which may be involved in the pending minimum price controversy, *subject to the condition that nothing in such agreement or contracts shall be construed as affecting any of the relations between the United States and its lessees, particularly in the matter of gas waste, taking royalty in kind*

---

[48] Tr. 107, p. 5342. To same effect see testimony of Thomas J. Reynolds, contract negotiator for Southern California Gas Company and Southern Fuel Company, Tr. 114, p. 5694.

[49] For discussion of these sections see infra under heading "Net Realization."

and *the method of computing royalties due as based on the minimum price.*" (Emphasis added.)

The lessees argue that the above ruling, which has been referred to during the trial as a "conditional approval", must be treated as a full approval, and that the Secretary's failure to pass upon the contracts until long after their submission to him amounted in fact and in law to an approval which precluded him from fixing the value of the products for royalty purposes.

The Secretary by his so-called conditional approval of the disposal contracts consented that the lessees might dispose of their products in accordance with the provisions of their contracts *upon the express condition* that the government royalty should be paid on the basis of the Secretary's valuations. The claim that this— even considering all the circumstances mentioned by defendants—was in effect an unconditional approval, is without merit.

By such consent the lessees were not hindered in the actual operation of their leased properties, and the Secretary in turn refrained from exercising the power residing in him under the leases, of closing the wells. This power, it will be remembered, was upheld in the Texas v. Wilbur case. The lessees had the privilege of continuing their operations, but .with the knowledge that the Secretary disapproved any basis of royalty computation which was not in accord with his minimum-price order. This was consistent with his entire position and conduct from the beginning. Notwithstanding what is to the court the apparent desire on the part of the Secretary to be fair to all parties, the Secretary did not relax his first position, that is, that royalties must be paid in accordance with his orders. And it appears that throughout the period in question the lessees must clearly have recognized his stand. He likewise undoubtedly was aware of defendants' contentions. While neither would recede, (both the Secretary and the defendants believing that they were justified in the respective constructions of the act, the leases and the regulations), each was cognizant that the disputed issue would be submitted to a court for ultimate determination.

The court is of the view that there was a distinct disapproval of the price terms of the contracts insofar as such price terms might vary or impliedly modify the right claimed by the Secretary to fix valuations for government royalty purposes.

Concluding, as the court does, that the Secretary was empowered under the act and the leases to fix the value of royalty gas and gasoline, and that the right so to do was not destroyed by his so-called conditional approval of the contracts which were filed with him, the next concern is whether the. Secretary properly exercised the reserved power.

Defendants contend that, in the issuance and attempted enforcement of the three orders (that of June 4 and 23, 1931, and June 7, 1937) they were denied both procedural and substantive due process. The authorities which they cite, however, are without exception cases wherein the courts were concerned with the exercise of sovereign, governmental powers, or if proprietary powers, they were non-contractual powers. Whereas in the exercise of such powers the officer of the government must act with due regard to the constitutional safeguards of procedural and substantive due process, the exercise of the contractual power does not so require.[50] That the exercise of power in the instant case is primarily one of contractual concern has been pointed out.

The test of the metes and bounds of the contractual exercise of power by a government official are variously expressed. In Gillioz v. Webb, 5 Cir., 99 F.2d 585, 587, it was said: "The function of the Secretary [of Labor, acting under a contractual provision] in thus ascertaining and declaring the prevailing rate of wages is not arbitrational, and in the nature of a judicial inquiry, and therefore requiring for its validity a formal controversy and hearing. It

50 Gillioz v. Webb, 5 Cir., 99 F.2d 585; Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074; United States v. Golden Gate Bridge, etc., D.C., 37 F.Supp. 505, affirmed 9 Cir., 125 F.2d 872, certiorari denied 316 U.S. 700, 701, 62 S. Ct. 1298, 86 L.Ed. 1769.

is that of an appraiser or valuer, a part of the process fixed by contract for determining a price, or an amount to be paid. * * * In the exercise of this function and *subject to the impeachment of his determination only for fraud, dishonesty or bad faith,* the Secretary of Labor fixes, as between the Government and contractor, and those who work on the job for him, the wages to be paid, in the same manner and with the same conclusive and binding force as private parties fix such matters by contract between themselves, * * * and as officers of the Government in other contracts fix and determine quantities, prices, and other vital issues referred to them by the contract, for fixing." (Emphasis added.)

In Goltra v. Weeks, 271 U.S. 536, 548, 46 S.Ct. 613, 617, 70 L.Ed. 1074, it was said: "The cases leave no doubt that such a provision for termination of a contract [between the government and a citizen in event of "non-compliance" with the leases of boats by the government] is valid, *unless there is an absence of good faith* in the exercise of the judgment [by the Secretary of War]." In United States v. Golden Gate Bridge etc., D.C., 37 F.Supp. 505, 511, it was said: "Courts cannot, *where there is no fraud*, relieve from a bad bargain." (Emphasis added throughout.)

Defendants urge that even if it be true, which they do not concede, that the Constitutional due process provisions are here inapplicable, that the "fraud" referred to in the cases just cited, means constructive or implied fraud, and will fairly include ignorance, inadvertence, gross carelessness or unreasonableness.[51] They cite Ripley v. United States, 223 U.S. 695, 750, 32 S.Ct. 352, 355, 56 L.Ed. 614, holding that the contractual power of an engineer to pass on preliminary work under a contract "raised a corresponding duty that the agent's judgment should be exercised *not capriciously or fraudulently, but reasonably, and with due regard to the rights of both the contracting parties*", and J. J. Moore & Co. v. Cornwall, 9 Cir., 144 F. 22, 30, wherein the court said: "It is true that the contracting parties agreed that the decision of the ma-

rine surveyor should be final. But they did not leave the question to his *arbitrary decision.*"

The plaintiff apparently agrees that the Secretary's action must have been reasonable. It says in its closing brief, page 88: "We have no quarrel with General over its statement of the law upon this subject provided that the last word 'unreasonableness' be given its real meaning, i. e., the absence of any rational basis. However, if General uses the word loosely, intending that is shall be taken as descriptive of a situation in which there is merely a *marked difference of opinion*, we think the word should be omitted."

The court concurs in the test established by the cases cited above, and holds that the Secretary's value determinations must be sustained unless it has been established by the evidence that the Secretary was guilty of fraud, dishonesty or bad faith, or that the exercise of judgment was capricious or so unreasonable as to be incapable of justification on any rational basis.

There has been no suggestion that the Secretary of the Interior has been guilty of actual fraud, dishonesty, or bad faith. Was his action, however, capricious or unreasonable within the foregoing meaning?

1. Reasonableness of Gas Formula

The Secretary's order of June 4, 1931, provided that "the minimum price basis for royalty settlements on gas in California has heretofore been fixed at 5¢ per 1,000 cubic feet * * *, such prices to be used in computing royalty accruing to the Government unless the lessee receives a greater price, in which case such greater price shall be used."

A total of 299,820,972 M.c.f. of dry gas was allocated by Kenda to its members during the years in question (July 1, 1931 to July 1, 1939). Of this total 200,275,544 M.c.f. were disposed of at prices in excess of 5¢; on this production government royalties were billed upon actual receipts. The remaining 99,545,428 M.c.f. were sold at less than 5¢, and for this amount the lessees were billed on the basis of the 5¢ minimum.

---

[51] Brief of General Petroleum, page 99.

An analysis of the sales of the 99,545,428 M.c.f. (sold for less than 5¢ per M.c.f.) discloses that 70,651,009 M.c.f. thereof were allocated by Kenda to Seaboard, Standard and Associated at prices ranging from 1¢ to 3-½¢. Within the period of this allocation these companies were selling Kettleman gas at prices varying from 5-¼₂¢ to 10¢ per M.c.f. Standard's sales contracts with Pacific Gas & Electric Company and Southern California Gas Company place a minimum limitation upon the price of 5¢ per M.c.f., irrespective of pressure, B.t.u. content or fuel oil price. Further, those contracts required that after the purchasing company had acquired a specified amount of gas from other producers it should thereafter take gas from Standard; or if it did not so take, it should pay Standard for an M.c.f. of gas for each M.c.f. of gas purchased from others.

The remainder (28,894,419 M.c.f.) was sold at prices ranging from 2-½¢ to 4-½¢ at a time when Standard, Shell and Seaboard disposed of 375,146,921 M.c.f. of Kettleman gas under contracts calling for prices in excess of 5¢ per M.c.f. In Seaboard's gas-disposal contracts the price was well above the Seaboard's minimum specifications. This is shown by the following cross-examination of one of plaintiff's witnesses:

"Q. Now, is it not a fact, Mr. Woodward, that during this entire period Seaboard's price for gas has been over 5 cents? A. Yes, sir, it has.

"Q. As a matter of fact, it has averaged about 9.3 cents, has it not? A. I presume it would be at least that high."

Shell likewise sold dry gas from the Kettleman field to Pacific Gas and Electric Company under a contract with a 5¢ per M.c.f. minimum price.

Defendants argue that the formula as applied was unreasonable in certain particulars, e. g., that it did not permit valuations to vary with pressure, B.t.u. content or the price of fuel oil; that there is a variance of prices between certain classifications of gas, such as "firm" and "excess"; as to the scarcity or plenitude of gas when certain contracts were entered into. The court in reaching its conclusion upon this phase of the case gave consideration to these contentions as well as to such responses as were made thereto by plaintiff.

It was particularly urged by one of the defendants that since the Secretary can determine value of gas for royalty purposes under section 2(c) (3) only where he has not acquiesced in the disposal thereof under an approved sales contract "or other method" he is precluded from determining value herein because he consented to the unit agreement whereunder the lessees surrendered to Kenda all gas to which they would otherwise be entitled. The court is of the opinion that such contention is not sound. The transfer was for the sole purpose of production and operation of the field as a unit. By no reasonable construction of 2(c) (3) could this transfer be deemed one within such section. Nor can it be said properly that by acquiescence in the unit plan the Secretary relinquished the plaintiff's rights under 2(c) (3).

Considering the entire evidence, the court is of the opinion that it is insufficient to show that the minimum-price order of itself, or as applied, is unreasonable or capricious. In fact, the court is of the view that the evidence amply sustains the Secretary's determination.

(a) The Net Realization Problem

Natural-gas royalties are payable on the gas as it is produced at the well. It is the value of that gas which must be determined. Ordinarily the gas as produced contains a certain amount of "casing-head" gasoline. If the gas is processed in an extraction plant, two products result, the natural gasoline and dry residual gas. Since part of the value of the gasoline and dry gas so manufactured is attributable to the extraction process, allowance must be made for the manufacturing costs in order to arrive at the value of the gas as originally produced.

The operating regulations of June 4, 1920, set forth in brief the method which would be followed in computing royalties on natural gas produced from government leases. The regulations of July 1, 1926, particularized the method (or methods) of

computation. These regulations of 1926 became a part of the lease contracts as written, and are binding on the parties before the court.

During the period from 1931 to June of 1937, the Secretary of the Interior followed the method of computation of natural-gas royalties set forth in subsection (d) of section 4 of the regulations of 1926. On June 7, 1937, by order issued to the Director of the Geological Survey, the Secretary directed that thereafter royalties were to be computed according to the provisions of subsection (c) of said section 4, if thereby a higher royalty would result to the government. This June 7, 1937, order (the so-called "net realization" order) has been strongly contested by the lessees now before the court. Its validity depends on the construction to be given to said subsections (c) and (d) of Section 4.

Subsection (c) provides that in general, where natural gas (gas as produced at the well) is delivered or sold for purposes of extracting gasoline, two separate commodities are involved, gasoline and dry residual gas. "If, however, the lessee receives a higher price for such natural gas as a single commodity than the combined value of the two commodities, the * * * gasoline and the dry residual gas, as fixed by the Secretary * * *, the * * * royalty shall be computed on natural gas alone and at the higher price received therefor by the lessee."

Subsection (d) provides that "In computing royalty on natural-gas gasoline the value of the raw gasoline in the natural gas as produced is assumed to be one-third the value of the * * * gasoline extracted from such gas, the remaining two-thirds being allowed to the lessee for the cost of manufacture. * * * If the lessee derives revenue on the natural gas from [both] * * * gasoline and dry * * * gas sold, the Government will normally collect a royalty on the two products. Therefore, if there is a market for the dry * * * gas * * *, a royalty on this gas * * * must be paid * * *."

As the court reads these subsections, the Secretary is given an election in computing natural-gas royalties. He may, and normally does, fix the value of dry gas and gasoline manufactured from the wet gas and sold by the lessee. On the basis of the value of such dry gas, as fixed by him, plus one-third of the value of the gasoline, as fixed by him, he computes the value of the wet gas as originally produced. This he does under subsection (d). He has an alternative, however, for ascertaining the value of the wet gas. He may start with the prices actually received by the lessee for the dry gas and gasoline extracted from the wet gas, rather than the value of such products as fixed by him, and therefrom deduct the actual costs of manufacture. This he does under subsection (c). The wet gas value thus arrived at, if greater than the value resulting from use of the 4(d) formula, becomes the value-basis for computation of royalties due the plaintiff.

Defendant Seaboard contends that in every instance where natural gas is manufactured into gasoline and dry gas two separate commodities result, and that in such event royalties may only be computed according to the provisions of subsection (d); that subsection (c) governs only when one commodity is involved. Thus it says that since all of its wet gas *was* manufactured into gasoline and dry gas, its royalties must be computed in accordance with subsection (d). It argues that subsection (c) prevails only when the wet gas itself is sold as a single commodity. The court is unable to agree with Seaboard's contention. Subsection (c) deals as well with the two commodities, and contemplates delivery of the wet gas for purposes of extraction. Note the language: "In general, where natural gas is delivered or sold for purposes of extracting gasoline, two separate commodities are involved— * * * gasoline and * * * dry * * * gas. If, however [that is, "if", though two commodities are involved] the lessee receives a higher price for *such* natural gas as a single commodity than the combined value *of the two* commodities * * *." (Emphasis added.) This construction is in line with the language of the regulations of June 4, 1920. It is there provided that "For computing the royalties provided for in the lease the value of all casing-head gas produced shall be assumed to be one-third of the value of

the marketable casing-head gasoline extracted from such gas, but if the lessee receives a higher price for casing-head gas than the equivalent of one-third of the value of the casing-head gasoline *manufactured from such gas* the royalties shall be computed on that price." (Emphasis added.)

It is believed that the distinction intended by subsections (c) and (d) to be made is a distinction between "price" actually received, and "value" as fixed or determined by the Secretary. Where "price" is the criterion, actual extraction costs are allowed; where "value" as fixed by the Secretary is the criterion the designated two-thirds of value is allowed for manufacturing costs. No distinction is intended to be made, as the court views it, between "single commodity", in the sense of gas that is not manufactured and the "two commodities" resulting from manufacture.[52]

■ It is accordingly held that the objections that the order of June 7, 1937, amounts to a denial of due process or that it is a repudiation of, or a misconstruction of, the lease contracts, are without merit. Royalties were properly sought, at the Secretary's election, after June 7, 1937, on the basis of net realization. Furthermore such method is essentially fair between lessor and lessee in ascertaining actual value of the commodities produced from the leased land. To base royalty on the value of production is one of the purposes of the act.

In computing natural gas royalties according to the "net realization" formula, the plaintiff and the defendants are in dispute concerning certain items. The first pertains to the "Long Commission", and presents the question as to what are "gross receipts" of the lessees within the meaning of the formula.

Early in 1931, the Pacific Western Oil Company and Kettleman Oil Corporation assigned to Kenda a contract for the sale to the Southern Fuel Company of dry gas produced from their leases. At the same time Kenda assumed a collateral agreement by Pacific Western and Kettleman Oil whereunder those companies had agreed with one F. R. Long that "if this contract [the contract of sale to Southern Fuel Company] is completed you will receive a commission of one-half * * * cent * * * on every thousand cubic feet [of dry gas] sold * * * during the life of the contract." In accordance with the assigned contract above mentioned, Kenda has sold the designated dry gas to Southern Fuel Company, and received payment therefor. Before surrendering the sums received from Southern Fuel Company to the lessees entitled, however, Kenda has deducted an amount sufficient to satisfy the side agreement.

It is the defendants' position that the "gross receipts" upon which their royalties are computable are the sums actually paid to them by Kenda, that is, the amount received by Kenda from Southern Fuel Company less the Long Commission. It is the government's position that the royalties are to be computed on the sum paid under the Southern Fuel Company contract before deduction of the Long Commission.

The defendants argue that the government does not compute the royalties to be paid by them on their actual receipts, but has added the Long Commission thereto, though they neither received nor paid that commission; that plaintiff is charging them with constructive, not actual, receipts. They urge that in reality the sales price of the gas, so far as Kenda was concerned, was the amount paid by Southern Fuel Company less the Long Commission, since Kenda when the Southern Fuel contract was assigned to it was required at the same time to assume the Long Commission obligation.

The government contends that the Long Commission contract provided for a commission for services rendered in negotiating a contract; that the commission was not provided as a part of the gas-disposal contract and cannot be used by the lessees in diminution of their "gross field realizations" for purposes of royalty computation.

---

52 The use of the term "single commodity" in 4(c) is intended only, it appears, to mean that the royalty is assessed on the natural (or wet) gas, rather than an assessment, as under 4(d) of 12-1/2 or 16-2/3% on the dry gas and another assessment of 16-2/3% on the gasoline.

The court is of the opinion that the Long Commission is an item of concern only between the lessees and Kenda; that it does not affect the royalty relations of the government with the lessees. The "gross field realizations" of the lessees within the meaning of the order of June 7, 1937, are the sums actually paid over by Southern Fuel Company to Kenda. That from such sums certain amounts were deducted in fulfillment of a contract for payment of a commission to Long is of no moment in determining the lessees' gross receipts.

The second item in dispute raises question as to whether, as a part of their "actual extraction costs" within the net-realization formula, the lessees are entitled to an allowance of a 6% return on their depreciated capital investment in the wet gas gathering system installed by them at Kettleman Hills.

As pointed out by General Petroleum, the wells at Kettleman Hills are scattered over an area 16 miles long and 3 miles wide. Wet gas from those wells must be collected and brought to the two or three absorption plants located at the field for processing. By July 1, 1931, over a million, five-hundred-thousand dollars' worth of equipment had been installed to bring the wet gas to the extraction plants. Additional equipment has been added as new wells were drilled.

The government has allowed the actual cost of operating this gathering system (¾ of a cent per M.c.f.) and, further, allowed depreciation on the capital investment in the gathering line as "actual extraction costs." It has refused to allow anything as return on capital investment.

The lessees seek allowance of a 6% per annum return on their depreciated investment. They argue that the gathering service performed in connection with the government's royalty gas is not a service owed the government—that the government is only entitled to its share of the value of the wet gas at the well; that by being allowed their operational costs and depreciation on their investment the lessees merely got back their investment without being given an allowance for the eleven-year use of that investment.

[4%]* return on the lessees' depreciated investment.

The government contends that the 6% return of capital investment allowance sought by the lessees is not a cost item which is properly allowable under the net realization formula; that it certainly is not an actual extraction cost, and that the government has already been more than generous in allowing deduction not only for actual costs paid to extracting companies and expenses of operating the gas-collecting system, but also for depreciation on capital investment.

It is the court's opinion that a 6% [4%]* return on the lessees' depreciated investment in the wet-gas gathering system at Kettleman Hills should have been allowed. It is as much a cost to them as their daily out-of-pocket expenses. If the lessees had had no gathering system of their own they would have been compelled to have that service performed by someone else. In such event the contract for that service would necessarily have included as elements of cost to the lessees not only the labor and other costs for operating the lines and depreciation on the capital investment therein, but as well a reasonable return on the capital investment in the facilities so used. When, instead of paying for the service to be done by someone else, the lessees performed that service for themselves and for the government, they were entitled to have the government royalty gas bear its proportionate share of these costs which daily accrued against them.

### (b) Buena Vista Storage Gas

Another matter in dispute between the lessor and lessees as to the dry gas royalties due involves the so-called "Buena Vista storage".

In the years 1931–1932, the defendants sought permission from the Secretary of the Interior to store in the Buena Vista Hills Naval Reserve certain excess residual dry gas for which there was no market, the gas being produced in connection with the production of so-called "white oil". The permission was sought so that the defendants might obtain the oil without incurring criminal penalties for blowing the gas into

---

* See note at end of case.

the air.[53] The Secretary permitted the storage on condition that the lessees pay their royalties on the gas as it was produced, that is, before removal to the Naval Reserve. The lessees were so billed. The latter, contending that their royalties were not due until the gas was recovered from storage and sold, did not render payment of royalties due until the ·gas was withdrawn from Buena Vista Hills and sold. Plaintiff claims that only a portion of the gas injected into the Buena Vista Hills was recovered and sold.

It is the court's view that the Secretary properly billed the lessees for gas royalties at the time the gas was produced at the leases, that is, before it left the field for storage. The Act, regulations and leases contemplate royalty payment to be made on the original production at the well. The royalty accrues *as* the gas is produced and *on* the amount so produced. The fact that for the convenience of the producer the gas is stored before ultimate sale should not change the time for royalty computation, nor should the lessor be penalized in the amount of its royalties by the fact that as a result of such storage some of the gas may not be recaptured.

## 2. Natural-Gas Gasoline

By his order of June 24, 1931, supra, the Secretary of the Interior modified the previously existing minimum-price basis for the computation of Government royalties on natural-gas gasoline as follows:

"Effective July 1, 1931, and until further notice for the purpose of computing royalty accruing from lands of the United States in California, the minimum price per gallon of natural-gas gasoline in the field where produced shall be based on the average service-station price, exclusive of tax, for gasoline of standard quality at Standard and Shell stations, in the metropolitan area of San Francisco and Los Angeles, as determined daily by the supervisor of oil and gas operations, U. S. Geological Survey, from published quotations or personal investigation, and shall be the sum of the following three items:

"(1) One cent;

"(2) One-half the excess, if any, of said service-station price over 5 cents;

"(3) One-half the excess, if any, of said service-station price over 15 cents; provided, that such minimum price shall be used in computing royalties unless a greater price is received currently for the natural-gas gasoline produced, in which case such greater price shall be used in computing royalties.

"The relation, under this rule, of service-station prices for gasoline and field prices for natural-gas gasoline is indicated in the following table:

| Service-station price | Field price |
| --- | --- |
| 5 or less | 1.0 |
| 7 | 2.0 |
| 10 | 3.5 |
| 15 | 6.0 |
| 20 | 11.0 |
| 25 | 16.0 |
| 30 | 21.0." |

The defendants have contended that, for various reasons, the above order of the Secretary of the Interior is arbitrary, unreasonable and capricious. The Court is convinced that the evidence is insufficient to justify these contentions. It is accordingly held that the order of June 24, 1931, pertaining to the valuation of natural-gas gasoline, is valid and that royalties based thereon were properly sought by the government.

## Accord and Satisfaction

Defendants contend that an accord and satisfaction was reached between them and plaintiff as to each monthly royalty payment for the period in suit (1931-1939) and that, therefore, plaintiff is not entitled to any money judgment herein. This defense is based upon the form in which the monthly royalty payments were rendered to, and accepted by, the government. That course of dealings between the parties is exemplified by the relations between defendant Seaboard and plaintiff.

Each month from and after July of 1931 until the filing of the present suit, Sea-

---

[53] California Conservation Act of 1929, St.1929, p. 923.

board tendered to the proper governmental official a check for royalties in the amount Seaboard conceded to be due. In every instance, the check was for a lesser amount than the amount required under the Secretary's orders. Attached to each check was a voucher in words substantially as follows: "Payee will detach and return this statement. Endorsement of the check attached hereto will constitute the payee's receipt * * * *in full payment of account stated below.*" (Emphasis added.) Upon receipt of these checks by the government agency they were stamped, cashed and returned to the lessee, the detachable voucher having been removed. The government did not object to the form in which the payments were made, nor return the amount so tendered. Later, however, the lessees were billed for the additional amount which the plaintiff claimed to be due. Defendants contend that by this form of payment, and the plaintiff's retention of the sums so tendered, an accord and satisfaction was effected.

Plaintiff maintains that the record discloses that there was no such meeting of the minds, as that required to support an accord; that, on the contrary, the parties at all times clearly understood that no accord had been reached. Plaintiff says that the lessees failed to rely upon this defense upon any of their appeals to the Secretary in the period in suit,[54] and, moreover, did not raise such defense until the time they filed their amended answers.[55] Plaintiff also cites certain testimony given at the trial by P. C. Black (Tr. 117, p. 5847), who represented defendant Continental at the Washington conference of 1932, to the effect that "all through the conferences [that is, the Washington conference of 1932] * * * [ran] the fact that *the royalties would accumulate and accumulate against us,* and that *we should have a prompt decision of the whole matter, in order that we might have an adjusiment, and know where we were standing.*" And again (Tr. 117, p. 5844), "We * * * stated that we had not paid, or at least most of us had not paid the demands made by the Government for the

differences in royalties and, therefore, had no cause of action against the Government; that *we would welcome a suit* by the Government *to determine those questions* in the event that such an action could be commenced without a cancellation * * * of our leases. Naturally, we were concerned about that. We discussed the question of the Government's suit against us, *. * *. We * * * also stated that if the Government should commence an action against us * * * *we would not file any dilatory pleas* in the action, *but would do everything in our power to expedite a trial and a decision of the questions involved; * * *.*" (Emphasis added.)

Plaintiff also relies strongly upon the case of Whepley Oil Co. v. Associated Oil Co., 6 Cal.App.2d 94, 44 P.2d 670, 676. In that case the defendant lessee rendered payment of royalties due to the plaintiff lessor by check carrying the endorsement: "Endorsement by payee * * * guarantees acceptance of it in full settlement of account as stated." The amount of the check was less than the lessor claimed to be due. The lessor, however, retained the amount so paid. In an action for additional royalties the lessee pleaded accord and satisfaction. The court held (p. 113) that there was no accord and satisfaction since "the [lessor] promptly advised the [lessee] that it took the position that it was entitled to receive a [greater] royalty [than was tendered] * * * and made seasonable request that the controversy be submitted to arbitrators as was provided in the contract. * * * [The lessee] acquiesced in the proposal for arbitration and * * * for a period of several months the parties endeavored to select a board of * * * arbitrators * * *. When it finally developed that [the arbitration could not be arranged], the parties agreed that the matter should be submitted to a court. The acceptance by [the lessor] of amounts smaller than it was demanding *during the time when negotiations for arbitration were being carried on is not indicative of an accord. It may not be argued*

---

[54] Seaboard was the sole exception. It raised the defense of accord and satisfaction in one of its appeals in the fall of 1938.

[55] Seaboard, the exception, pleaded accord and satisfaction in its original answer.

*successfully that [the lessor] who, during all this period, was insisting that it was entitled to larger royalty payments, evidenced an intention to abandon its claim by its acceptance of smaller amounts."* (Emphasis added.)

 There would appear to be a strong similarity between the Whepley arbitration-negotiation situation and the factual situation before this court. As hereinbefore related, and considering first the payments made between July 1, 1931, and January of 1932, plaintiff upon receipt of each check so tendered, promptly billed the lessee for the additional amount due under the Secretary's orders. The lessees appealed from such billing and urged that the appeals be promptly heard. It is the court's view that, in the words of the court in the Whepley case, and regardless of the form in which the checks were tendered, "the acceptance by the [lessor] of amounts smaller than it was demanding during the time when negotiations for" a hearing upon the appeals "were being carried on is not indicative of an accord. It may not be argued successfully that [the lessor] who, during all this period, was insisting that it was entitled to larger royalty payments, evidenced an intention to abandon its claim by acceptance of smaller amounts."

 As to the period after January of 1932, the testimony of Mr. Black hereinbefore quoted discloses that the lessees and the government expected and intended a judicial determination of the dispute regarding the Secretary's authority which would finally determine the issue. Such testimony agrees with the statement of the Secretary in his opinion of November 30, 1932, that "the appellants have also indicated an intention to litigate these issues." Throughout that period the anticipated litigation proposed at the Washington conference lay back of and influenced the parties' dealings. There was the same suspension of final settlement of the dispute—the same negation of intention on the part of plaintiff to abandon its claim—as the court held was preserved in the Whepley case.

The conclusion here reached, that no accord and satisfaction resulted in the period in suit, is arrived at without regard to the plaintiff's argument relative to the lessees' failure to cite this claimed defense upon their appeals.

### Laches and Estoppel.

Certain defendants have interposed the defenses of laches and estoppel, and contend that it would be inequitable to allow plaintiff a recovery herein. Their argument is that throughout the period from 1931-1939, the lessees were required to produce from their leased properties; that it would have been impossible to store the large quantities of the government's royalty oil; that they of necessity had to dispose of such production by sale or other means; that the Secretary neglected and failed in performance of his duty to take action on the contracts so filed with him in some instances until 1939, when he sought to give conditional approval thereof; that his failure to pass on the contracts amounted to an unreasonable delay, either misleading the lessees into believing the contracts met with his approval or in fact having the effect of amounting to unconditional approval. They argue, further, that the government unreasonably delayed in bringing this suit after the defendants had made substantial concessions in order to obtain an early hearing.

The plaintiff contends, on the other hand, that the lessees were required by the terms of their contracts with the government to pay a specified percentage of the value of their products; that they were notified in 1931 that, in the Secretary's opinion, they were not obtaining by their disposal arrangements the true value of those products; that they had knowledge that the government would not accept royalties based upon such sales prices, but would expect them to account for royalties on the basis of his orders; that the government's position was constantly reiterated by the monthly supplementary billings of the supervisor for an amount over and above what the lessees paid, as computed in accordance with the Secretary's orders; that the Secretary reaffirmed his position through denial of the many appeals filed with him throughout the period in question. Plaintiff contends that the conditional approval amounted to no more than a pro forma recognition of his prior de facto

refusal to accept the sales-contract prices as the criterion of value for royalty purposes.

So far as the integrated defendants are concerned, it is the court's opinion that the defenses of laches, estoppel and want of equity are clearly unavailing. To their posted prices, as the court has heretofore found, is attributable an artificial market wherein commodities were sold at prices below their true market value. They now cannot be heard to complain of the government's conduct in the premises, and they have shown no case which appeals to equity.

So far as the non-integrated defendants are concerned, the problem is more difficult. The non-integrated defendants, as has been adverted to, of necessity had to produce from their leases and to dispose of such production. In such disposition they were compelled to accept the prices offered them by the integrated companies, or seek another market. If they chose to take their production to another market then, according to plaintiff's contention in another connection, they would suffer a loss due to mixture of gravities in the pipe line transportation. They elected, rather, to sell in the Kettleman market and accounted to their lessor for royalties due on the basis of the prices received by them. They duly filed copies of all disposal contracts, thereby giving notice to the Secretary of the amount of money they were actually receiving for their products. These defendants urge upon the court their claim that they were entitled to an approval or disapproval of such contracts within a reasonable time, for, as their leases provided (§ 2(d), when the Secretary elected to take the government's royalty in money, technically at least, they could not sell or otherwise dispose of their production except in accordance with a contract approved by the Secretary. They waited some years before being advised formally by the Secretary as to whether their disposals met with his approval. Plaintiff answers the non-integrated defendants' contention by saying that they were compelled to pay on the basis of value, and that there was no guaranty to any lessee that there would be an open market at Kettleman Hills. A view of the entire evidence does not indicate an endeavor on the part of plaintiff to place any defendant at a disadvantage in attempting to solve what appeared to be the very perplexing problem of determining the amounts due as royalties from the leased lands. It shows, rather, that the Secretary at all times acted in good faith; that he sought at the Washington conference to reach a settlement of the dispute which would be satisfactory to all parties; that he notified them at that time that the government did not intend to seek a cancellation of their leases, and that in his opinion both the government and the lessees would benefit by having the question determined by judicial proceedings. The Secretary sought to avoid the drastic consequences of the action under consideration in the Wilbur v. Texas case; that is, he attempted to adjust matters without having to close the wells and thus shut off their production. His failure, if any, in the premises, lay only in his omission to make formal rulings on the sales contracts and promptly to initiate legal proceedings.

This much seems true: *the non-integrated defendants knew as a matter of fact at all times that the price terms of their disposal contracts were unacceptable to the government.* They knew this from the Secretary's consistent and repeated demand for additional royalties throughout the period. They knew from and after the Washington conference what position the government was taking and that suit would be brought to recover the additional amounts which the Secretary claimed to be due. They knew, finally, that the statute and leases required them to account in royalties on the basis of *value.*

Have the non-integrated defendants been injured by the plaintiff to the extent that it would be inequitable to require further payment from them? As the court views it, they have not. It does not appear that such defendants have been misled or that they have changed their position to their injury by any action of plaintiff, or that it is sought by this action to compel them to pay more that they were obligated to pay under their contracts.

The defenses of laches and estoppel and want of equity are found to be without

merit both as to the integrated and the non-integrated defendants.

### Special Position of Standard Oil Company of California

There remains one final point to be considered. Standard of California has at all times accounted to the plaintiff for all royalties which the plaintiff has claimed. As to it the plaintiff has sought a declaration that the Secretary had the power to require the payments so made, and that he properly exercised that power. The right to such declaratory relief has been repeatedly and vigorously contested by Standard.

Defendant Standard contends that as between it and plaintiff there exists no such justiciable controversy as will admit of declaratory relief. It argues that there is no evidence to show that Standard has ever failed to pay any royalty which the plaintiff has sought from it, no evidence that it has sued or threatened to sue to recover any royalties which it has paid, no evidence that in the future it will refuse to pay the royalties which plaintiff requires, no evidence that it will, after payment, sue to recover such future payments.

The record discloses that while Standard has paid all royalties which plaintiff has required, it has, on the occasion of each such monthly payment, filed a written statement to the effect that payment other than on the basis of its posted prices, in the case of crude oil, or its contract prices, in the case of gas and gasoline, was "made under protest and without waiving our company's objection to the bases of computation demanded by the government." Statements accompanying the protest in each instance computed accruing royalties on two bases, that specified by the Secretary and that contended for by Standard. Two checks were attached to the statement, one for the amount which Standard conceded to be due, the other for the additional sum required according to the Secretary's orders.

It is true that these monthly protests do not contain a positive assertion of intention or threat to sue to recover royalties paid to plaintiff. The language of the protests falls just short of any such assertion. If it were to be assumed (though the court herein is not to be understood as so holding) that a single protest in the terms employed by Standard evidences a mere dispute or difference of opinion or the registering of objection short of a judiciably-cognizant controversy, it is apparent that repeated protests, month by month over a period of eight years, no longer have any such import. The cumulative effect of such a series of carefully-worded protests raises the "difference of opinion" which a single protest conceivably might evidence, to the dignity of asseveration of intention to attempt to regain the sums so protested. The intention so to do is a present danger, casting a cloud on the right of the government to retain that which already has been collected, and the right to receive in the future continued payment. It likewise beclouds the validity of the payments which the government has made to the State of California under the provisions of the Mineral Leasing Act, 30 U.S.C.A. § 191.

These threats or clouds on plaintiff's right to retain the sums so collected from Standard of California justify the court in rendering a declaratory judgment respecting Standard.

The foregoing opinion was read by the court from the bench December 28th and 29th, 1944.[56] At the conclusion of its reading the court stated that it would be necessary to reopen the case upon the question of value of crude oil unless the parties were able to reach some agreement which would obviate the necessity for further evidence. No such agreement was reached, and the case was reopened September 18, 1945. Evidence as to the value of crude oil from July 1, 1931, to August 29, 1935, was received. In addition, testimony was taken as to certain other phases of the case. The taking of testimony was concluded in October, 1945.

After further consideration of the evi-

---

[56] At the time of the delivery of the opinion certain portions thereof were omitted for the purposes of expedition. This was announced at the time.

Also, there have been some minor changes made in the wording of the original opinion. These do not affect the substance.

dence and the arguments of counsel, the court's views remain unchanged as to the issues covered in its opinion of December 28 and 29, 1944.

The court invited the parties to submit methods or formulas for the computation of market value of crude oil at Kettleman Hills for the period beginning July 1, 1931, and ending August 29, 1935. This was to be done without any party's waiving the right to maintain any position such party assumed or desired to assume as to the issues, but was to be only for the purpose of aiding the court in establishing the terms of the judgment it believed proper. The parties accordingly submitted such formulas. These have been carefully studied by the court, but the court finds each of them inconsistent with its views of the evidence.

It has been held that if there is no open market in the place where an article ordinarily would be sold, then the market value of such article in the nearest open market, less cost of transportation to such open market, becomes the market value of the article in question. Having this in mind, and that Midway-Sunset was the nearest field of importance producing the general type of crude oil obtained from Kettleman Hills, the court's idea was that the Midway-Sunset field might supply the basis of market value. The court so remarked, in effect, in the course of the trial in October, 1945, (and after it had stated in its opinion of December 28–29, 1944, that there was no open market at Kettleman Hills from July 1, 1931, to August 29, 1935). The view so expressed was conditioned upon the adherence of the court to its opinion that there was no open market at Kettleman Hills, and with the provision that the evidence would justify the use of Midway-Sunset market value for such purpose, but that if it did not, then the market value of the appropriate crude oil in some other California field should be so employed.

While a comparison of the treatment accorded the oils produced at Kettleman Hills and Midway-Sunset as to valuation ("total value" and "net value computed at the wells," Exhibits 63 g–1) and market prices (posted prices) was proper in examining the question of the existence or non-existence of an open market, the court need not consider whether any comparison between the products of these two fields would serve as well in the solution of the present problem, that is, what market should be used to establish the market value of Kettleman Hills production. Such consideration is unnecessary because of the admissions of the parties.[57] (September— October, 1945). These admissions will be referred to presently.

It has been heretofore shown that in California gravity alone is not an invariable criterion for determination of the value of oil. There is substantial variation in valuation of oils of the same gravity in many California fields. It appears, however, that there is *slight* difference in such valuation between Kettleman Hills oil and Santa Fe Springs oil of the same degree of gravity (see Table A, supra). The parties, moreover, by their admissions virtually agree that Kettleman Hills and Santa Fe Springs oils are substantially identical in quality and as to refinement requirements, and that the market value of Santa Fe Springs crude oil properly may be used as the basis for the market value of Kettleman Hills oil. Such view is not only acceptable to the court, but from the evidence the court must infer that during the period in question the crude oils of Kettleman Hills and Santa Fe Springs possessed substantially the same properties which made them of value as marketable products, that they were alike in quality and were substantially the same, gravity for gravity. Accordingly the market values at Santa Fe Springs are selected for determining Kettleman Hills market values.

In arriving at the market value for Kettleman Hills oil, however, an allowance must be made for the difference in transportation costs. Here the court has recourse to the computations, and to the testimony of the witness McCammon for the cost differential between the two fields. The transportation costs were ten cents per barrel less at Santa Fe Springs than at Kettleman Hills. The court, therefore, concludes that the market value of Kettle-

---

[57] The problems, too, are obviously different.

man Hills crude oil from July 1, 1931, to August 29, 1935, was gravity for gravity the same as that of Santa Fe Springs, less ten cents per barrel.[58]

As the range of gravities at Santa Fe Springs is not entirely co-extensive with the range of gravities at Kettleman Hills, an extrapolation for the higher Kettleman Hills gravities will have to be made. This will be at the rate of increase between gravities shown in the Santa Fe Springs posted prices.

Plaintiff's counsel will prepare findings in accordance with this opinion.

### Supplemental Opinion

[Interest was allowed by the Court upon certain amounts of the recoveries of plaintiff.]

The court is of the opinion that the rate of interest proposed by plaintiff, to-wit, 7%, is excessive. It is a matter of common knowledge that the rate of interest prevailing in this community on sums approximating the amounts designated in the judgment, was, for the period in question, less than 7% per annum. Such rate of interest was approximately 4% per annum. The court finds that interest at the rate of 4% is fairly compensatory, and it establishes such rate as just compensation.

NOTE: The court held in its main opinion, filed March 30, 1946, that the lessees were entitled to a return of 6% per annum on their depreciated investment in the wet-gas gathering system installed by lessees. When the court rendered its supplemental opinion January 10, 1947, it was of the view

that 6% was excessive, and that 4% per annum was fairly compensatory, and ordered that a finding (No. 24) be made that "interest at 4% per annum on such capital investment" be allowed. (The foregoing "return" is referred to in syllabus 24 herein.)

---

[58] Substantially the same results are obtained by using the figures for Midway-Sunset on an end-point—and—residuum basis (two-product method). For example, we take 30 gravity Midway-Sunset oil (schedule effective June 26, 1932, exhibit 63 k), having end point stock of 41.8% and residuum of 57.7%. This has a "total value" of $1.285. After deducting the "manufacturing and transportation" charges of $0.15, we have a net value computed at the well of $1.135 and a posted price of $1.12. Compare this with 35 gravity Kettleman Hills oil (end-point stock 41.5%, residuum 58%), and we find this latter has a "total value" of $1.281. With the same deduction for "manufacturing and transportation", to wit: $0.15, we have a net

value computed at the well of $1.131. Assuming that Midway-Sunset is an open market, then the market price (posted price) is the market value. The market value, therefore, of Kettleman Hills oil would be the same, i. e., $1.12 per barrel for 35 gravity crude oil.

Compare further this last-mentioned oil with Santa Fe Springs oil on a gravity-for-gravity basis. Santa Fe Springs oil of 35 degrees of gravity had a posted price effective June 26, 1932, of $1.22. Assuming that Santa Fe Springs was an open market and making allowance for the transportational difference of $0.10 per barrel, we have a market value for Kettleman Hills 35 gravity oil of $1.12.